No. 709

## First Circuit

BRANDON ET AL. v. GOTTLIEB ET AL.

(January 26, ·1931.   Opinion and Decree.)
(May 5, 1931.   Rehearing Refused.)
(June 22, 1931.   Writs of Certiorari and Review Refused by Supreme Court.)

Taylor & Parker and Fred G. Benton, of Baton Rouge, attorneys for plaintiffs, appellants.

J. Y. Sanders, Jr., of Baton Rouge, and J. C. Hollingsworth, of New Orleans, attorneys for defendants, appellees.

LeBLANC, J. Plaintiffs are the father and mother of a young negro boy who was injured in an elevator accident in the Cangelosi building in the city of Baton Rouge, on Thursday, July 21, 1927, and died as a result of his injuries on the following Saturday, July 23, 1927. They seek to recover damages in the sum of $12,000 for the death of their son, which, they allege was caused through the negligence of the lessee of the building, Lewis Gottlieb, in maintaining an old and dilapidated elevator therein and in not having an experienced and competent tender operating it on the day that he was injured. The Metropolitan Casualty Insurance Company of New York, indemnitor of the lessee of the building, is also made party defendant to the suit, and judgment is prayed for against both defendants in solido.

Plaintiffs allege in their petition that there had been a pretended adjustment and settlement of all claims for liability, which they aver was obtained under certain circumstances and conditions detailed by them at length, all of which they attack on the ground of fraud and misrepresentation on the part of defendant Gottlieb's agent, M. E. Byrd, and also on the part of one W. A. Merchant, claim adjuster and representative of the Metropolitan Casualty Company, the other defendant.

This purported settlement in compromise or release, as it is styled, formed the basis of an exception of no cause of action, which was sustained by the district court in December, 1927. On appeal to this court, the judgment of the lower court on the exception was reversed and the case was remanded to the district court for further trial on the merits. See Brandon v. Gottlieb et al., 8 La. App. 415.

Defendants resist the claim on three grounds: (1) That the settlement in which plaintiffs accepted $350 was a complete adjustment of any and all claims they might have against them, and operated as a release which they aver that it is, from all liability whatever for any damages that might arise out of the injury and death of their son, all charges of fraud and misrepresentation are of course denied; (2) that there was no negligence on the part of the lessee of the building whatsoever; and (3) that plaintiffs' son, by his own wanton and gross negligence contributed to his own injury and resulting death.

It was on the Friday following the Thursday on which the accident happened that the question of a settlement was first broached. Byrd, Gottlieb's agent, had gone to the hospital where the injured boy was, to see how he was getting along. He says that while there he was asked something by the boy's father as to how the expenses were going to be paid. He answered him that he thought the company (meaning no doubt the insurance company) would pay all the doctors' and hospital expenses. With this opening, which offered an opportunity of adjusting what might eventually turn out to be, as it subsequently did, a large claim for damages, Byrd lost no time in getting into communication with Merchant, the claim adjuster of the insurance company. Merchant came from New Orleans to Baton Rouge on the following day, Saturday, and, after a hurried investigation of the accident, he and Byrd had a conference with the boy's father and one of the latter's friends named Joe King. A

proposition to pay $350 cash for a release from all claims for damages, at the same time disclaiming all liability, was submitted, but it was not accepted that day. It was the same proposition which however resulted in the signing of the release by the plaintiffs a few days later.

It seems that from the very beginning there was no hope for the boy's recovery. Byrd appreciated that fact, as the testimony reveals. It was on the very Saturday that they were trying to effect a settlement that he died, and we hesitate to think that, on that unfortunate day for them, his parents were in a condition of mind to consider and carefully weigh the details of a proposition which meant the relinquishment of any and all claims for damages for the death of their son. The matter of settlement did not seem to be that pressing, and it might have been more proper to defer for a day or two at least the opening of any negotiations leading thereto.

However, as already noted, plaintiffs did not accept on that day, the offer made to them, and we would not be disposed to set aside the release because of these agents' impropriety alone, if their action may be so termed, were it not for another more important and serious circumstance surrounding its confection, which in our opinion, affects its validity.

In their investigations of the accident, Byrd and Merchant learned that there was but one person who claimed to have seen how it happened. That was Mrs. O. P. Kennedy, a lady who with her husband occupied offices on the second floor of the building. She was interviewed by them and gave an account which would appear unfavorable to the defendants. In making their offer to the plaintiffs, Byrd and Mer-

chant laid before them their theory as to how their son was injured, based on facts learned by them, which would indicate that he alone was at fault. They did not, however, give them the information which they had obtained from Mrs. Kennedy, according to which, the boy was injured through the gross carelessness of the operator of the elevator. Their reason for withholding that information they say, was because Mrs. Kennedy refused to commit her statement to writing and also because of some remark made by her which satisfied them that she was not telling the truth. The fact that they did not believe her did not give them the right to suppress what she had told them when they came to deal with the plaintiffs in order to obtain a release from them. The latter were entitled to the benefit of that information as well as the other information they had received and judge for themselves of its truth or falsity. It would have been fairer not to give them any of the knowledge they had and let them make their own independent investigation. By disclosing only a part of it and suppressing some, they led these plaintiffs into an error of fact, which it may be said "comes under the head of fraud" which is sufficient to invalidate the contract. Civ. Code, arts. 1821, 1832, also Civ. Code, art. 1847, pars. 2 and 5.

In view of the conclusion we have reached with regard to the release, we can dispose of the defendants' contention that it cannot be set aside until plaintiffs have returned or tendered the return of the money they received, by referring again to the former judgment rendered by this court in this case reported in the 8 La. App. at page 415, from which we quote:

"No one can retain the benefits under a contract and lawfully avoid its consequences. There will be restitutio in integrum.

The party who wishes to avoid the consequences must first offer to restore the other to the situation he occupied previous to the contract. Although we are not referred to any statutory law to that effect, we believe that this is an elementary rule in jurisprudence. The Civil Code, Art. 1913, provides that in order to enforce a commutative contract or to secure damages for its non-performance, one must first tender to perform his part of the obligations under the contract, but we are not referred to any article providing that in order to set aside a transaction one must offer to return that which he may have received when the transaction was entered into, and for that reason, we say that such a rule originated in jurisprudence and is solely founded upon equity. Our Supreme Court substantially so held in the case of Germaine v. Mallerich, 31 La. Ann. 372, where it says that 'it is purely an equitable rule, and would be abused by allowing wrongdoers to avail themselves of it as a condition precedent to the undoing of their own illegal acts.' "

We now reach the merits of the controversy.

It will be recalled that there were two specific charges of negligence against the defendant Gottlieb: One, that he maintained as the only elevator available to the public in this building this old, inferior, and antiquated type, in which the accident occurred; and the other that he had in charge thereof, as operator that day, an inexperienced and incompetent one-armed negro man, through whose wanton and willful negligence the boy was injured and subsequently died.

Outside of the testimony of Mrs. Kennedy, who says that it looked like an antique, and who refers to it as being "old and rickety," we find nothing in the record to show that the elevator was faulty in construction, or that it was "dangerous and hazardous and a death trap in itself,"

as is alleged in plaintiff's petition. True it was not of the modern express type, but Professor Hamilton Johnson, professor of mechanical engineering at Louisiana State University, who had examined it carefully, says that it "is of the ordinary type of small, moderate speed elevator." It is of standard make, and he also testifies that at the time he examined it, "the machinery seemed all right." We find that it had been constantly in use by the public as well as the tenants of the building. Moreover, it is not pretended now that the condition or the age of the elevator was the proximate cause of the accident, so we can pass on to the other charge of negligence; that is, the incompetence and inexperience of the operator and his wanton and willful carelessness in injuring the plaintiffs' son.

To condemn the defendants in damages on this charge, we would have to accept Mrs. Kennedy's testimony at its full face value and decide the case on that evidence alone.

In the first place, her testimony bears a stain left by the remark she is reported to have made when she was first interviewed by Byrd and Merchant. She seemed solicitous about Byrd's interest in the matter, and told them both, so they say under oath, that "if necessary she would swear to a lie to help him." That was the remark which, they say, satisfied them that she was not telling the truth about the accident and which served as their reason for not revealing the information she gave them to the plaintiffs, when they were negotiating with them for a compromise. It is true that in rebuttal Mrs. Kennedy denies having made such remark, but she admits that her husband was present at the interview referred to and heard all

that was said, and yet he does not join her in her denial of this most damaging assertion against her as a witness. His silence under the circumstances is rather significant.

More important, however, in our consideration of her testimony, is the fact that we are unable to grasp the details of her version of the actual happening. And these are most important. She has the operator of the elevator doing too much, at one time, with his single arm and hand, to charge him with responsibility for this boy's death. She says that he was arguing with the boy; that while arguing with him, he was shoving him and edging him away from the door the boy insisted on entering; that he closed the door, pinning the boy in it as he did so, and then started the elevator by turning the wheel which was used as the control. All of this, according to her further statement, took place "in a very short space of time" as necessarily it had. That a one-armed, and as is claimed, inexperienced elevator tender could have done all this in the time it took for this accident to happen, seems to us to be highly improbable, if indeed, not physically impossible.

She would make it appear that the boy's body was pinned or jammed in the door of the cage surrounding the elevator shaft, and that, as the elevator went down, the boy was struck on the side of his face by the iron bar forming the top part of the frame of the opening in the carrier. Considering the small space of only a few inches between the cage and the carrier, that also would seem physically impossible. If his body was so pinned and it was the iron bar across the opening of that descending elevator that struck him, then indeed, as Professor Johnson says, either one of two things would have happened: The elevator would have stopped, or else the boy's body would have been cut in two. Neither of these things happened, and we are left again in utter uncertainty as to how the accident occurred under her version of it or the theory advanced on behalf of the plaintiffs.

On the other hand, there is abundant proof to show that this unfortunate boy was unusually meddlesome, especially so about and around elevators. He seemed to have a hobby to try and do "stunts" around them. This is shown not only with reference to the elevator in which he was injured, but also to the one in the Court House building when he had occasion to go there. He worked in a drug store on the lower floor of the Cangelosi building, and had strict and positive instruction not to use the elevator unless he was delivering soft drinks to the tenants in the building. At the time he was injured, he was not and had not been engaged on such errand. He had been warned repeatedly about the danger he seemed to be inviting, but was stubborn and gave no heed to the warnings.

The operator of the elevator does not know how the accident happened. He denies that he argued with the boy, as he says that he did not even stop at the second floor on which he was, as no signal was given for a stop. He had taken some passengers to the third floor, and, as he was going down again, on passing the second floor and when the floor of the elevator was about two feet below the second floor of the building, he heard what he refers to as "a burst into the door, and the next thing was something fell on the top of it" (meaning the top of the elevator). This something was the body of that poor boy, who once again, most probably, had not obeyed the instructions given

to him, and had failed to heed the warnings of danger.

We are not aware from the judgment of the lower court which dismisses the suit whether it was on the ground that the plaintiffs were bound by the release which they had signed, or they had failed to prove their case on the merits. Inasmuch, however, as we have the whole record before us on the merits, and we fail to find it shown that this accident happened by reason of the negligence and carelessness of the defendant Gottlieb, the judgment dismissing the suit against him and his indemnitor, the Metropolitan Casualty Insurance Company of New York, will be affirmed.

ELLIOTT, J. (dissenting). I agree with the majority of the court that the compromise agreement, urged by the defendants, should be set aside on the ground that it was not based on plaintiffs' "consent legally given," Civil Code, art. 1779, "with regard to a matter understood by all, reciprocally communicated," Civil Code, art. 1819. But, on the merits, I think the plaintiffs have established their case. Plaintiffs' claim, however, is not established without the testimony of Mrs. Kennedy, and, if her testimony is seriously discredited, the result is the same. The majority of the court do not accept her testimony. Her testimony is said to bear a stain left by the remark she is reported to have made when first interviewed by Messrs. Byrd and Merchant. It is said of her that she seemed solicitous about Byrd's interest in the matter, and told them both, so they say under oath, that, if necessary, she would swear to a lie to help him. That was the remark which they say satisfied them that she was not telling the truth about the accident, and which served as their reason for not revealing the information she gave them to the plaintiffs when they were negotiating with them for a compromise. "It is true," the opinion says, "that in rebuttal she denied having made such a statement, but she admits that her husband was present at the interview referred to and heard all that was said, and yet he does not join her in her denial of this most damaging assertion against her as a witness. His silence under the circumstances is rather significant." I find on this subject that Mr. Kennedy testified that he was present when his wife related to Messrs. Byrd and Merchant what she claimed to have seen, that the interview took place in his office and on his invitation to defendants' agents that his wife would tell them all she knew about the occurrence; but he was not asked on the trial if his wife had offered in his presence or within his hearing to swear to a lie, if it would help Mr. Byrd. Therefore, when it is said that "he did not join her in her denial," it must be taken to mean that he was not asked about the matter, Mr. Byrd's testimony on the subject, and that of Mr. Merchant, cannot all be quoted, but Mr. Byrd says in one place:

"Q. What if any thing was said by Mrs. Kennedy after she asked you whether you had any interest in the matter as to her statement or testimony?

"A. She asked if it meant anything to me. I told her I was agent for the Company. If I remember correctly her words were something like this (addressed to Mr. Merchant and myself). If necessary she would swear to a lie to help me."

No reason appears why Mrs. Kennedy should volunteer to do such a thing to help Mr. Byrd in this matter. He is in no way, as far as the record shows, personally responsible for the occurrence. If he has any kind of claim on her, it does not appear in the record.

682

The law, Civil Code, art. 2282, provides that, when a party is in the actual service of another, it "may, according to circumstances, diminish the extent of his credibility."

Messrs. Byrd and Merchant are and were at the time, in the actual service of the defendant insurance company. Mr. Byrd, in addition, had charge of the building in which the occurrence took place as the agent of Mr. Gottlieb, and was also in that way in the actual service of Mr. Gottlieb at the time in question.

This attack of defendant's agents on the credibility of Mrs. Kennedy, whose testimony is so important to the plaintiffs, makes it necessary to consider matters shown by the record which takes from the force of the attack. Mrs. Kennedy, according to the testimony of herself, and what she says in that respect does not appear to be denied by Messrs. Byrd and Merchant, informed Messrs. Byrd and Merchant at the interview in question, that the boy Alvin and herself were the only parties at the time on the second floor and that the boy Alvin was at the elevator cage ringing the bell; that the elevator had been to the third floor and had stopped at the second floor and an argument was going on between the operator, a young negro man with one arm, named Albert Robertson, and the boy Alvin, which she did not hear (witness was hard of hearing); that the boy Alvin seemed to be trying to push his way into the elevator, and the operator trying to keep him out. She further stated:

"The next thing I saw was the operator closing the door, and when he did that, he pinned the little boy in the cage of the elevator. The elevator operator had only one arm and he took this same arm that he closed the door with and started the elevator down and the little boy was pinned in the door. And he must have been hurt when the elevator passed and crushed his head and turned it to the side because he stayed a fraction of a second in this cage with his head between his shoulders like that (indicating). A second later, he plunged down head foremost on top of the elevator which by that time had gotten to the first floor."

After hearing this statement from Mrs. Kennedy, Mr. Merchant requested her to sign a written statement of the facts, and, upon her refusal to do so, advised her that the best thing she could do was to keep her mouth shut; that, if she did not, they would make a liar out of her, or used words to that effect. The record indicates that this advice was effective for a time at least, because, between the time the boy was injured and the offer to compromise and the several days during which plaintiffs had the offer under advisement, then accepted and signed a receipt, and the still further time that elapsed after the receipt was signed before the $350 was received and expended in the way shown by the testimony, not a fact or circumstance indicates that plaintiffs became aware of what Mrs. Kennedy claimed were the facts as to how their son received his injury.

After Messrs. Byrd and Merchant had heard Mrs. Kennedy's statement about the occurrence, they lost no time in procuring from the plaintiffs a settlement of their claim for damages, paying them $350, and they admit in their testimony that, in bringing it about, they represented to the plaintiffs that, according to an investigation which they had made, it seemed to them that plaintiffs' son Alvin, in disregard of repeated warnings to let the elevator alone and keep out of it, had in some way gotten open the door to the shaft on

the second floor, and must have jumped on top of the elevator as it passed, in effect killing himself; that they did not then, nor any time since, make known to the plaintiffs the statement that had been previously made to them by Mrs. Kennedy as to how the occurrence had taken place and according to whom the boy Alvin had stopped the elevator at the second floor and was trying to get into it against the will of the operator, who pushed him out and closed the door on him in such a way that he pinned him in between the elevator door and the wall of the shaft, fastening him there, and the operator with the boy thus fastened then started the elevator downward, crushing the boy's head in the descent.

Their explanation that they did not make known to plaintiffs what Mrs. Kennedy had informed them about the matter, because they did not believe that the occurrence had taken place in the way she claimed it did, invites an inference unfavorable to their attack, but no explanation was offered for having advised Mrs. Kennedy at the time that it would be well for her to keep her mouth shut, and what she might expect if she testified in court in conformity with her claim to them as to how the occurrence had taken place. Conduct of this kind should be deducted from their attack and the same duly appreciated. The credit of Mrs. Kennedy is to my mind, not seriously impaired.

Taking her to be a credible witness and giving proper effect to corroborating facts and circumstances and to the inferences and presumptions which naturally arise, it seems to me that the plaintiffs have established their case. The court, however, finds otherwise, holding that she has the operator of the elevator doing too much

at one time with his single arm and hand to charge him with responsibility for the boy's death. Among other matters of which the court makes mention, it is said that she would make it appear that, as the elevator went down, the boy was struck on the side of his face by an iron bar, forming the top part of the frame of the opening of the carrier. There was evidence introduced showing that an iron bar extending across the upper part of the front frame of the elevator had been bent near the middle, but this iron bar could not have injured the boy according to the testimony of Mrs. Kennedy. The evidence in fact showed that this bar had been bent prior to the occurrence, and therefore the bend could not be connected with the injury in question. Then again this bend in the bar mentioned was over the doorway, while the boy, according to Mrs. Kennedy, at the time he was injured, was pinned in between the closed door and the wall of the shaft, which would make the place where the wall corners on the shaft opening. A comminuted fracture of the skull on the right-hand side of the head, the side of the face mashed in, and both jaws broken at the same time would seemingly be the natural result to a person fastened as this boy is said to have been, should an elevator descend upon him, if his head was in the path of descent. Sidonia Brandon, the boy's mother, went to his bedside at the hospital as soon as she heard about his injury, and, upon getting there, she asked him questions, and her statement as to what the boy said in reply, being received without objection, is as follows:

"Q. Alvin who hurt you?"

And she says he replied:

"Mamma, Albert hurt me."

She then said to him:

"Tell me how he hurt you."

She says he answered:

"When I get better I will tell you all about it."

She says that she asked him some further questions about the matter, but no further information was obtained. Albert was Albert Robertson, the operator of the elevator at the time in question. The accusation of this boy tends to support Mrs. Kennedy as to who hurt him. Mrs. Kennedy further states:

"A second later he plunged down head foremost on top of the elevator, which by that time had gotten to the first floor."

When the elevator reached the first floor, the boy was found on top of it in the condition heretofore mentioned.

The defense set forth in article 10 of defendant's answer is in effect that the boy Alvin Brandon picked the trap lock on the door of the elevator shaft, without the knowledge of defendants, and, after the elevator had passed the second floor, he forced open the door and fell on the elevator cage and its protruding iron parts, his acts constituting the sole negligence in the case, pleading, however, contributory negligence in the alternative.

The testimony of Albert Robertson, the operator, is in part as follows:

"Q. Where do you think Brandon was?
"A. I don't know.
"Q. You are positive that he was not standing at the elevator door?
"A. He wasn't standing at the elevator door.
"Q. He could have opened the door with a pencil, the latch on the door was so loose that anybody could open it with a pencil or stick?
"A. I don't know how he opened it, but it was fastened. I had it fastened. It wasn't open at all.
"Q. You testified when you were being examined by Mr. Hollingsworth that as you passed the door, it was closed. Is that a fact?
"A. Going up.
"Q. I mean coming down.
"A. The door was closed.
"Q. And you testified that it remained closed as you were passing. Is that a fact?
"A. Going which way?
"Q. As you were coming down.
"A. Yes, sir. It wasn't open then, I didn't see it open."

Later he stated again that the door to the elevator on the second floor was closed when he passed, and that the boy Alvin was not there, at least he didn't see him; that he did not stop at the second floor; that the first he knew about the matter was after he had gotten about two feet below the second floor something fell on top of the elevator.

The motive of self-exoneration should be taken into account in considering the testimony of this operator, employee of the defendant.

If the boy Alvin had been at the elevator door as the elevator passed, he would probably have been seen. He says that he did not see him. If the boy was not at the door and if the door was closed and fastened as he says and if the elevator did not stop at the second floor as he says, then the boy could not have gotten on top of the elevator when it was about two feet below the second floor.

But suppose for the sake of argument that the witness be not believed and suppose it be taken that the boy was at the

door, the door open and that the elevator passed him there without stopping, and that the boy accidentally fell in, or intentionally jumped in the open shaft, the strong probability is that he would have gone down feet foremost, and, in a drop of two feet, his head and face and jaws would not have been crushed and broken as was found to be the case. A plunge down head foremost can easily be conceived as the result of a fatal injury received in the way stated by Mrs. Kennedy. It would not likely have occurred except in that way. In such a situation there exists the presumption res ipsa loquitur.

The defense argues, and the majority of the court hold, that a one-armed operator could not have pinned the boy between the door and the wall of the shaft and started the elevator downward all at one and the same time.

It is not claimed by Mrs. Kennedy that the operator did all this with his one arm and hand, at one and the same time. Her testimony as to how the operator managed, is stated at length, and a fair appreciation in my opinion does not justify such a conclusion. She was questioned, as if such was the result of her statements on the subject. She was asked:

"Q. You don't mean for the court to understand, that a one-armed man with one arm was pushing the boy and also holding the elevator door too, do you?
"A. Not at the same time."

The operator no doubt moved quickly, and all that he did could have been, and no doubt was, the result of quick movements. He had been operating the elevator all day. The regular operator was a one-armed man.

For my part, giving credit to Mrs. Kennedy as a witness and taking into account all the facts and circumstances, it is my conclusion that it appears with reasonable certainty that plaintiffs' son was injured as claimed by them.

The petition charges the defendants with gross willful negligence in the matter, and the evidence received without objection to my mind requires a holding that the action of the operator was wanton and reckless within the sense and meaning of the law on the subject of negligence. It is my conclusion that the operator pulled the door against the boy, pinning him in between the door and the wall of the shaft, and, while the boy was thus fastened, the operator started the elevator downwards, the elevator crushing the boy's head in its descent as stated by Mrs. Kennedy in her testimony; that the operator knew and must be charged with knowing that the elevator in its descent was bound to injure the boy as was done in the predicament he was in. As the operator could not help seeing the predicament of the boy, it became his bounden and immediate duty, to hold the elevator off of him and to not let it descend, until he could see that the boy had extricated himself and gotten out of the way of danger. The operator did not have it purposely in mind to kill the boy, but, as he could not help seeing the predicament the boy was in, his lack of malice and intent did not prevent his act from being willful, wanton, and reckless within the meaning of the law on the subject of negligence.

And, as against an injury wantonly, willfully, and recklessly inflicted, the negligence of the boy, his mischievous conduct in ringing the bell, stopping the elevator, and trying to get into it against the will and wish of the operator, after having been warned of the danger, told to keep

away from the elevator, and to keep out of it, is no defense.

"If the wrong on the part of the defendant is so wanton and gross as to imply a willingness to inflict the injury, the plaintiff may recover, notwithstanding his own ordinary negligence, and this is always to be attributed to the defendant, if he might have avoided injuring the plaintiff notwithstanding his own negligence," etc. Ruling Case Law, vol. 20, subject, "Negligence," pp. 144 and 145, sec. 116, Ruling Case Law, Permanent Supplement, subject, "Negligence," vol. 7, p. 4845, sec. 118.

A wanton act implies a thoughtless disregard of consequences, without the exertion of any effort to avoid them. Thompson on Negligence, vol. 1, pp. 246, 247, secs. 265 and 266.

Where the conduct of the defendant is wanton and willful, or where it indicates that degree of indifference to the rights of others which may justly be characterized as recklessness, the doctrine of contributory negligence has no place whatever, and the defendant is responsible for the injury he inflicts, irrespective of the faults which placed the plaintiff in the way of such injury. Cooley on Torts (2d Ed.) subject, "Redress for Negligence," pp. 810, 811; 21 Louisiana and Southern Digest, "Negligence," sec. 27; 21 Louisiana and Southern Digest, Second Supplement, "Negligence," sec. 27; Ross v. Sisters of Charity of Incarnate Word, 141 La. 601, 75 So. 425, L. R. A. 1917F, 260.

I think the judgment appealed from is erroneous, and that it should be reversed and judgment rendered in favor of the plaintiffs for the amount proper under the evidence, and I therefore respectfully dissent.