LOTTINGER, Judge.
This Í9 a suit brought by Davis Williams for damages for the death of his eleven year old daughter who was struck on U. S. Highway No. 190 between Slidell and La-combe, Louisiana, on October 8, 1951, by an automobile owned and driven by the defendant, John F. Robison. The original petition recited that on October 9, 1951, the plaintiff signed what he later learned to be a full release of all his rights and claims arising from the accident and death for the sum of $600, but that he “was ignorant of the normal everyday business transactions” and “did not know what this paper purported to be.” By supplemental and amended petition, it was prayed that the release so executed be declared null and void.
The defendant first filed exceptions of no right and no cause of action which were referred to the merits by the trial court. An answer was then filed which denied the material allegations of the petition and which pleaded the release in bar of the action. Alternatively, it was set forth that the accident was due solely to the negligence of the child and, further in the alternative, it was pleaded that the child was guilty of contributory negligence.
Following trial on the merits, judgment was rendered in favor of the defendant and the matter is now before us on an appeal taken by the plaintiff.
We address ourselves first to the question of the validity of the release. Virgil Williams, brother of the plaintiff, testified that he signed the release as a witness. He stated “I signed it but I didn’t know that was all the money Davis was going to get.” He stated further that the insurance man read the papers but he did not understand them. He did not actually see William Jones (the other witness) sign the paper as he was starting to sign as he was walking off, nor did he see Davis Williams sign the paper. He is able to read and write a little and does mostly manual labor for the Town of Slidell.
On cross examination he stated that he did not know what a release was and that while the paper was read to him there was plenty that he did not understand. He also understood that Davis Williams was getting $600 but didn’t know if he was getting any more or not. The amount received, he thought, was just for the funeral. At the time of the signing he stated that only himself, Davis Williams, his brother’s wife, Elizabeth, the wife of one Elmo were on the porch and William Jones. He said that he did not remember Davis Williams saying that he understood the instrument before he signed it, or that if he did, he did not hear him so state. He repeated that he did not see Davis Williams sign the paper and that he did not know how many papers he did sign.
William Jones, called on behalf of the plaintiff, testified as follows: He is the husband of Mary Williams Jones who is related to Davis Williams as a second cousin. He knew nothing of the accident of October 8, 1951, but did state that the decedent was waked on the 9th of October, 1951, and was buried on the 10th. He talked to an insurance agent between 11:30 and 12 o’clock on October 11th. With respect to the papers that were signed, he testified as follows: “That day when we went there, the insurance man asked us would we sign the paper for Davis Williams to get $600.00? I said I would and asked what was that for? He said to pay for the brial, etc. I asked Davis Williams if he wanted me to sign and he said ‘Yes,’ so I went on and signed.” This was on the day after the funeral and present besides the insurance man were Davis Williams and Isabelle Williams. He stated that he did not know what was in the paper and that the insurance agent tried to read to them “but he was so fast.” He *66 did not see either Davis or Virgil Williams sign the paper, and stated that everyone was in a hurry as they were going back to work. He had a fifth grade education but did not remember hearing the word “release” mentioned.
On cross examination, he testified as follows: That he is employed by the Town of Slidell as a laborer to clean ditches, cut grass, etc. He stated that while Davis Williams had asked him to come sign the paper, he did not tell him much of what was going on although he imagined it was for her death. When asked if it was not a fact that he objected to the matter saying that Davis was not getting enough, he said “Yes, Sir.” He denied knowing that $600 represented more than the funeral bill and stated that Davis had told him that he was going to get more in the future besides the $600. He knew that Davis had a check for $600 but didn’t know what it was for.
Isabelle Williams, called on behalf of the plaintiff, testified as follows: She is related to Davis Williams as a sister. The insurance man came to her house on October 11th, which was the day after Doris was buried. Present at the time were Davis Williams, William Jones and Virgil Williams. She gave this version of what transpired:
“Q. Tell the court what conversation took place. A. He came and asked Davis Williams to sign the paper. He said he didn’t think he should sign the paper just then and I said ‘Don’t sign it, Davis, wait and go to Mr. Marshall Thompson and talk it over,’ and the insurance man said ‘Don’t wait and talk to Mr. Marshall Thompson it was Davis Williams’s daughter and he could sign it for himself.’
“Q. Were the people just named present during this conversation? If so, what else was said? A. Yes, Sir. I went back in after he kept on at him to sign it and after he told me it was Davis Williams’s daughter and he could do what he wanted, they signed on the porch and I went on back inside.”
Davis Williams, called on his own behalf, testified as follows:
He saw the insurance man on two occasions, first the day after the accident and the following day. The first time he saw him the man had some papers which he wanted him to sign but he did not sign it then and “I studied a while before I signed it, if I signed it.” He got the money ($600.00) the day after Doris was killed. He stated that he thought the money was for the funeral and that he was going to get some more money. He stated that he did not know what he signed, that he cannot read and that he did not understand what was being read to him. He went to the first grade but did not finish and had no schooling since then. He denied knowing what a release or a settlement is. He stated that he could not read numbers, that he did not remember the amount of the funeral bill and that Virgil Williams had attended to that for him.
On cross examination, the witness testified as follows:
The child was killed on October 8th which was a Monday and she was waked all day Tuesday and buried on Wednesday the 10th. He was contacted by the insurance man before she was buried, the place being at Elmo Williams’s house before the funeral. He then admitted that he came to get his marriage license and birth certificate of the child and signed the paper on the day of the burial after she had been buried. The release was read to him in full and when asked if he understood what every word in there meant, he answered, “Yes, Sir.”
On re-direct examination, when asked why he went to a lawyer, he said “I went there trying to see if I could get a bit more money than what I got there.”
On re-cross examination, he stated that a lot of people told him that he had not *67 gotten enough money and that when the release was presented to him, William Jones and Isabelle had both told him not to sign it. He also admitted paying a funeral bill of $292 on October 18th, the Wednesday following his child’s death.
Mr. L. W. Mahoney, called on behalf of the defendant, testified as follows:
That he was employed by the American Employer’s Insurance Company, the liability insurance carrier of Mr. John F. Robison. He took a statement from Virgil Williams on October 10 at about 4:30 in the afternoon and when presented with the statement he identified it as the one that he had taken and the one that Williams had signed on the 2nd page.
He stated that he first saw Davis Williams on October 10 at about 3 o’clock which was after the funeral. He said he took a statement from him at his home at that time and when presented with D-2 he stated that that was Williams’ signature and his statement. The statement was read back to him at that time and he next saw Williams on the next day, October 11th. The witness identified the draft and the release. He related the obtaining of the release as follows:
“A. On October 10th, it was Thursday, to the best of my knowledge, drove up to his home, inquired from his mother if he was home, he had returned to work and he wouldn’t be home until noon time, then I could locate him when he returned to the house from Canulette Shipyards. I went over to the house, this was right before 12 o’clock, about 11:45 A.M. and waited for him to arrive.
“Q. He didn’t come? A. Yes, Sir, he arrived.
“Q. Tell the court what transpired then. A. I spoke to him and we went over the case and I told him from the testimony of witnesses, etc. that the company felt that there was not much liability in the matter, but as a sympathetic gesture, we were willing to make an offer of from $500.00 to $600.00. He said he would take it.
“Q. Did you prepare the release for his signature? A. I did, I took my portable typewriter and we went on the porch. They had between 8 and 12 people, to the best of my recollection, and I proceeded to type out the release and draft for $600.00 which he said he would be willing to take. After making out this release, I read it to him in the presence of the people around him. At the time some said the $600.00 was too small. I said the father is the legal guardian, if he was willing to take it, it is up to him. After I wrote this up I explained to him once he signed this he had no comeback. He appeared to understand this and by that time Virgil Williams and William Jones came on the scene and they verified his signature after the release was read to him.
“Q. They all heard you read it ? A. Yes, Sir.”
From the above and foregoing, we are satisfied (as was the trial judge) that the plaintiff knew what he was signing and was fully aware that the sum of $600 more than covered the funeral expenses, which he was bound to know amounted to less than $300. While we do not admire the insurance adjuster for attempting to close the case so quickly, the record fails to show any over-inducement on his part, nor does it show .that the plaintiff, through his ignorance, bereavement or otherwise, did not understand what he was signing. The case of Brandon v. Gottlieb, 16 La.App. 676, 132 So. 283, 285, relied on by counsel for plaintiff, is not apposite here for there the court found that by “disclosing only a part of it [information concerning the accident] and suppressing some, they led these plaintiffs into an error of fact, which it may be said ‘comes under the head of fraud’ which is *68 sufficient to invalidate the contract,” a factual situation not present here.
The question is a factual one and we find no manifest error in the findings of the Lower Court.
Judgment affirmed.