160 So.2d 785 (1964)
Henry B. COLE, Jr., et al., Plaintiffs-Appellees,
v.
LUMBERMENS MUTUAL CASUALTY COMPANY et al., Defendants-Appellants.
No. 1049.
Court of Appeal of Louisiana, Third Circuit.
February 18, 1964.
Durrett, Hardin, Hunter, Dameron & Fritchie, by Calvin E. Hardin, Jr., Baton Rouge, Stafford & Pitts, by John L. Pitts, Alexandria, for defendants-appellants.
Gravel, Sheffield & Fuhrer, by Camille F. Gravel, Jr., Alexandria, for plaintiff-appellee.
Donald Garrett, Alexandria, for defendant-appellee.
Before TATE, FRUGE, and HOOD, JJ.
TATE, Judge.
This is a suit for damages caused by personal injuries. The plaintiff Henry Cole's minor son, Denzel, lost part of his leg in a motor vehicle collision. Prior to trial, Denzel became emancipated by marriage and was substituted as a party plaintiff for recovery of general damages and of special damages incurred subsequent to his emancipation.
The plaintiffs sue (1) the driver (Jarrett) of the other vehicle involved, (2) the driver's employer (Hempen), and (3) a liability *786 insurer (Lumbermens) which had issued liability policies insuring both the driver Jarrett and the employer Hempen.
The defendants appeal from adverse judgment casting them for the sum of forty thousand dollars (of which $2,908.24 were the stipulated special damages incurred by the plaintiff father prior to the son's emancipation). The plaintiff son answers the appeal, praying that the award in his favor be substantially increased.
Although there is a great deal of argument and testimony concerning the facts of the accident, the virtually uncontradicted evidence shows the following:
The plaintiff son, Denzel, was riding on his motor scooter down Third Street, the principal business thoroughfare of the city of Alexandria, proceeding at a reasonable speed. As Denzel approached a side-street dead-ending into Third to make a T-inter-section with it, the defendant Jarrett drove from the side-street into and across young Denzel's immediate path. Both Jarrett and Denzel knew or believed the much more heavily traveled Third Street to be the right-of-way thoroughfare.
Under these circumstances, there is little doubt that Jarrett's negligence, in entering into the right-of-way thoroughfare in the immediate path of the right-of-way vehicle, was the sole proximate cause of the accident. Nor under the facts could young Denzel have reasonably anticipated this gross disregard of his right-of-way by Jarrett, in time for him to have avoided the accident; nor in any other way could he have been guilty of contributory negligence barring his recovery.
Under the evidence, it is likewise unquestioned that, at the time of the accident, the driver Jarrett was engaged in the performance of his work for his employer Hempen, as a result of which Hempen was liable under the doctrine of respondeat superior for the negligence of his employee while in the course and scope of his employment. LSA-C.C. Art. 2320.
In our opinion, therefore, the only substantial questions of this appeal concern: (1) Is the plaintiff's claim barred by a release that the plaintiff father had executed with court approval, approximately one month after the accident? (This release was especially attacked by the plaintiff's petition; it was set aside by the trial court as a result of hearings in advance of the trial on the merits.); (2) Are the damages of forty thousand dollars awarded manifestly insufficient?
1. Setting aside the release.
The trial court set aside a release entered into by the plaintiff father, by which he had compromised his son's claims for $5000, the full limits of a liability insurance policy issued to Jarrett, the defendant driver. The Jarrett policy covered operation of the demonstration vehicle personally owned by him but also used by him in the performance of his duties as automobile salesman.
The release in question was executed by the plaintiff father on September 4, 1959, less than a month after the accident. The release was executed on a standard printed form, and by it Denzel's father and mother forever released "Emmett Jarrett and Lumbermens Mutual Casualty Company and any and all other persons, firms, and corporations" from any further liability resulting from the accident of August 6, 1959.
In overruling the pleas of res judicata and in setting aside the release, the trial court rendered excellent and comprehensive written reasons for judgment which, in our opinion, adequately dispose of all the factual and legal contentions raised by the defendants to the effect that the release in question was valid and should not have been set aside, and that it is a complete bar to this action.
Without re-analyzing in detail the evidence concerning the release, we think that, as the trial court stated, it shows beyond a doubt:
At the time of the accident, the defendant Lumbermens was Jarrett's liability insurer *787 under a $5000-limit policy covering his own individual car which was involved in the accident. At the same time, Lumbermens was the insurer of Jarrett's employer, Hempen, on a $50,000-limit policy which covered Hempen's liability for accidents caused through the negligence of Hempen's employees in the course and scope of their employment.
Soon after the accident, both of these circumstances were known to Lumbermens and to its adjuster handling the plaintiff Cole's claim against it arising out of the accident. At the same time, Lumbermens and its adjuster were fully aware that there was no defense to the substantial claim against it and both of its insureds, by reason of the loss of the young boy's leg, since Jarrett's fault was unquestionable and since he was unquestionably engaged at the time in his work for the defendant Hempen.
The evidence also proves that Lumbermens, through its adjuster, with design to avoid having the plaintiff Cole retain an attorney to handle the tort claim and thus learn of this much greater exposure, actively promoted a quick settlement for the full $5000 policy limits of the Jarrett policy only, upon both active and implied representations that this was the sole insurance policy applicable to the accident, that Jarrett was financially irresponsible and could not respond in damages, and that therefore it was to Cole's interest to accept the full $5000 limits, instead of retaining an attorney and having to share with such attorney approximately one-third of this very limited recovery (in view of the heavy medical expenses to be expected from the loss of the son's leg).[1]
The evidence further conclusively proves that the only reason the plaintiff father agreed to settle his son's very serious claim for $5000, and the only reason the court approved authorization to settle same for this low figure, was because of the belief that this $5000 policy was the only responsible source of payment for the young boy's serious injuries, since Jarrett himself could not personally respond in damages.
What is even more important (as will be shown), however, is that the defendant Lumbermens through its agents knew that this mistaken belief was the only reason the plaintiff Cole consented to settle his son's far more substantial claimas to which, fault-liability was not at issue at the time the insurer settled for its supposed full policy limits. Additionally, the defendant Lumbermens actively promoted this mistaken belief by conversations with the Cole parents and even with the attending orthopedist (who was naturally interested with regard to payment for the expensive medical services).
As to the law applicable to these facts:
Under the civilian law of obligations, legally given consent of both parties is requisite to the validity of a contract, so that there is no consent and no valid contract where the consent has been produced by error or fraud. LSA-C.C. Arts. 1779, 1819, 1824.
Compromises are a species of contract which cannot be attacked because of error of law, but which may be rescinded because of error of fact, or in the case of fraud. LSA-C.C. Arts. 3078, 3079. However, as stated in McCastle v. Architectural Stone Co., La.App. 1 Cir., 4 So.2d 120, 123: "As a general rule, a compromise settlement cannot be set aside for an error of law alone, yet if the error was caused by what was said or done by the other party under such circumstances as to lead the person in error to rely on such act or statement, there is such a mistake as will justify setting aside the agreement. C.C. Art. 3079; Reed v. Holderith, 3 La.App. [378], *788 379; 15 C.J.S. Compromise and Settlement, § 36c, p. 758."
An error of fact is that "which proceeds either from ignorance of that which really exists, or from a mistaken belief in the existence of that which has none." LSA-C.C. Art. 1821. It is not every error that will invalidate a contract, only an error as to some point "which was a principal cause for making the contract", including error "as to the motive for making the contract". LSA-C.C. Art. 1823.
As to error in the motive, LSA-C.C. Art. 1824 provides: "The reality of the cause is a kind of precedent condition to the contract, without which the consent would not have been given, because the motive being that which determines the will, if there be no such cause where one was supposed to exist, or if it be falsely represented, there can be no valid consent." Further, "The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the motive, and means that consideration without which the contract would not have been made." LSA-C.C. Art. 1825.
Likewise, and it is important to note the words italicized by this court: "No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it." LSA-C.C. Art. 1826. Additionally, "* * wherever the motive is apparent, although not made an express condition, if the error bears on that motive, the contract is void. * * *", LSA-C.C. Art. 1827.
See, for excellent discussion, Smith, A Refresher Course in Cause, 12 La.Law Rev. 2, 29 (1951).
Such principles also apply to the annulment of a compromise on the ground of error. LSA-C.C. Arts. 1828-1830. "But if the compromise be of all differences generally, and there were other subjects of dispute, besides that in which the error existed, of sufficient importance to raise a presumption that, even if the error had been discovered, the compromise would still have been made, then such error shall not invalidate the contract." LSA-C.C. Art. 1831. (That is, if there had been a genuine dispute as to negligence, etc., then the erroneous belief of the Cole parents might nevertheless not have been sufficient to annul the compromise, in the absence of fraud.)
Finally, and most pertinently here, "In all cases, however, when the information, which would have destroyed the error [as to the motive, or principal cause], has been withheld by the other party to the contract, it comes under the head of fraud, and invalidates the contract." LSA-C.C. Art. 1832.
LSA-Civil Code Article 1847 further defines fraud, as applied to contracts, as "the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other."
This code definition of "fraud" continues, LSA-C.C. Art. 1847:
"1. Error is an essential part of the definition; an article [artifice] that can not deceive can have no effect in influencing the consent, and can not injure the validity of the contract.
"2. The error must be on a material part of the contract, that is to say, such part as may reasonably be presumed to have influenced the party in making it; but it needs not be the principal cause of the contract, as it must be in the case of simple error without artifice. * * *
* * * * * *
"5. It must be caused or continued by artifice, by which is meant either an assertion of what is false, or a suppression of what is true, in relation to such part of the contract as is stated in the second rule. [Clause 2 quoted above.]
*789 "6. The assertion and suppression, mentioned in the last preceding rule, mean not only an affirmation or negation, by words either written or spoken, but any other means calculated to produce a belief of what is false, or an ignorance or disbelief of what is true. * * *"
Applying this law to the present facts, our trial brother correctly concluded:
"Cole and his wife had been led to believe that there was no question of liability, merely a question of how much they could expect to recover for their son. The Coles, the undertutor Beavers, and [the District Judge who approved the settlement] all had been told this. * * * Therefore, it cannot be said that Cole [the father] entered into this compromise because he feared he would lose his lawsuit or that he feared that his son could not recover any more than $5000 for his extremely severe injuries and disability; certainly his principal motive, in these circumstances, was the erroneous conviction that $5000 was all that could be recovered. And this was the very point which was affected with the fraud in this case. Even if it were found that fraud did not exist, since the error of fact concerned the principal cause of the contract, the contract would still have been voidable. Under Article 1847, even simple error without artifice is sufficient to nullify a contract if it is on the principal cause of the contract. [See also Civil Code Articles 1823-1825, quoted above, under which a contract is voidable for error in the principal cause, i. e., the motive.]
"The result is the same, however, if the erroneous conviction that he could only recover $5000 was not Cole's principal motive for entering into the compromise contract. If it was not the principal motive, it was beyond a doubt one of the material motives. Under Article 1847, if error induced by fraud bears on a material part of the contract, this is sufficient to nullify the contract.
"But certainly the evidence shows artifice in the dealings between defendants and Cole in this case. And under the particular language of Article 1832, a finding of artifice (in the sense that word usually connotes) is not even necessary. The law does not require that a party alleging fraud in the confection of a contract of compromise needs to prove that he has been the victim of some grand conspiracy, trickery and outright deceitful lies. Instead, `when the information which would have destroyed the error, has been withheld by the other party to the contract, it comes under the head of fraud, and invalidates the contract.' There is no denying that Cole was acting under an error of fact, that the other party knew this and that the other party withheld the information which would have destroyed such error. The error affected at least `a material part of the contract', if not `the principal cause.' Accordingly, there is fraud within the meaning and intent of the law, and such fraud afflicts the contract with nullity."
The trial court further held that Lumbermens was acting as the agent and in the interest of its insureds, Jarrett and Hempen, in procuring the release, so that therefore the release should be annulled against both of them as well as against Lumbermens.
For the reasons stated above, we affirm the trial court's annulment of the compromise release entered into on behalf of the injured party, because the requisite valid consent was not present, since the agreement was entered into by reason of an error of fact as to the principal or at least a material cause of the contract, which error was known by the other party to be the sole reason for the agreement to the compromise, and which error was in fact induced and abetted by the actions of the other party so procuring the thus-invalid consent to the compromise. McCastle v. Architectural Stone Co., La.App. 1 Cir., 4 So.2d 120; Brandon v. Gottlieb, La.App. 1 Cir., 16 La.App. 676, 132 So. 283. The cases relied upon by the defendants-appellants (Spears v. St. Charles Dairy, La. App. 1 Cir., 194 So. 738 and Brewster v. *790 J. C. Byram & Co., La.App. 2 Cir., 149 So. 118) expressly held that any errors of fact therein were not inducing causes for entering into the compromises there attacked, and are distinguishable for such reasons as well as other factual distinctions.
2. Damages.
By answer to the appeal, Denzel Cole, the plaintiff son, requests that the trial award in his favor be increased as manifestly insufficient. Although the defendants-appellants deny any liability at all, they do not seriously question the amount of the award if recovery is affirmed.
The trial jury awarded a total of $40,000 damages. After deduction of the special damages incurred by the plaintiff father prior to the son's emancipation by marriage (as to which no question is raised in this appeal), the plaintiff son received a net of $37,091.75 for his own general and special damages.
As a result of the accident, Denzel, then nearly 16 years of age, suffered excruciating pain and shock, and the lower two-thirds of his left leg was amputated from about four inches below the knee.
Denzel will, of course, suffer from this disfigurement, loss of mobility, and loss of prospective fields of occupation or earning power for the rest of his life expectancy, which it does not seem to be disputed should be estimated as about fifty years beyond the date of the accident. See Am. Jur.2d Desk Book, Document No. 140.
In addition, in order to minimize his disability and inconvenience, the plaintiff son is required to undergo further surgery within the next year or so, and will require another artificial leg, all of which medical expenses immediately to be incurred will approximate $2,500.
Additionally, also, the plaintiff will suffer special damages for medication, etc., over the rest of his life expectancy of nearly fifty years, which the medical evidence indicates should average not less than $215 per yearfor award purposes, however, this average annual expenditure spread out over fifty years is not computed at its gross figure, but instead to the discounted present cash value of the sum necessary, with interest thereupon, to make the plaintiff whole for these expenditures over the course of his lifetime. See Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891. (For instance, using the 5% per annum discount figures in the Compound Interest and Annuity Tables, 1955, Financial Publishing Co., p. 671, the present value of the sum necessary to assure 50 annual payments of $215 each is approximately $3,925.)
Taking into consideration such factors, we believe the award to the plaintiff reasonably represents slightly more than $30,000 general damages for his past and future pain and suffering, loss of function and disability, potential effect on his loss of earnings by reason of his disability, etc.
We agree with able counsel for the plaintiff that the evidence could reasonably justify a much more substantial award.
On the other hand, however, the trial jury saw and heard young Denzel and also was in a position to evaluate the circumstances surrounding the loss. The evidence shows that, despite the painful and serious injuries, Denzel missed only eight weeks of school after the accident, and he graduated with his class. Following graduation, he obtained employment in several positions, most recently as a posting and production clerk, and the medical and other evidence indicates that he can compete for about 70% of the jobs in the labor market which would have been open to him had he not suffered the injury. The jury could reasonably conclude that young Denzel has adjusted well to his misfortune, and that, despite it, he will have a productive and happy life.
*791 As the Supreme Court recently stated, Gaspard v. LeMaire, 245 La. 239, 158 So. 2d 149, 158, 160:
"The primary purpose of the judge or the jury in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case. * * * The primary question before the appellate court, then, is whether the judge or the jury in fixing the amount of the award has abused this great discretion vested in them by law. * * *
"* * * [E]ach case is decided on the basis of its own peculiar factual circumstances, which may vary greatly from case to case even involving somewhat similar injuries. * * * Since an award of damages for personal injuries is of necessity somewhat arbitrary and also must vary greatly with the facts and circumstances of each case, the trial court is entrusted with large discretion in making such awards. * * *
"`Thus, on appellate review of a trial court award for pain and suffering, the question is not to calculate with any mathematical exactitude any fixed amount as alone proper under the circumstances, nor to attempt to reconcile widely variable and in fact irreconcilable past awards for injuries which in the abbreviated appellate discussion of them seem somewhat similar. The function of the reviewing court is simply to determine whether the present trial court award is manifestly excessive or manifestly insufficient under all the circumstances of the present case.'"
Considering all the circumstances reflected by this record, we are unable to say that the trial jury abused its large discretion in making this award or that, although low, this award is manifestly insufficient. We therefore affirm it. Cf., e. g., award of general damages in Whatley v. Scogin, La.App. 3 Cir., 143 So.2d 833; see also Annotation, Excessive Damages Personal Injury, 16 A.L.R.2d 3, Section 106 (Loss of one leg), together with cumulative supplements to this annotation, for wide range of awards for loss of one leg.
Decree.
For the foregoing reasons, the judgment of the trial court in favor of the plaintiffs, is affirmed at the cost of the defendants-appellants.
Affirmed.
NOTES
[1] Although it is unnecessary to do so, we expressly comment that Lumbermens's able and honorable attorney who prepared the compromise did not participate in this course of conduct. His only function was to prepare the papers after the Coles' agreement to the compromise was procured by Lumbermens's agents.