## HEAD v. REX DRILLING CO., Inc., et al.

### No. 5648.

Court of Appeal of Louisiana. Second Circuit.

June 1, 1938.

Harry V. Booth, of Shreveport, for appellant.

J. Fair Hardin, of Shreveport, for appellees.

HAMITER, Judge.

Serious burns were received by plaintiff during the afternoon of January 26, 1936, as the result of the explosion of a gas line used by the Rex Drilling Company, Inc., in connection with its drilling of an oil well near Rodessa, Louisiana. Several days previous to the named date he had performed one day's work at the place of operations as a substitute for a regular employee, and when the accident occurred he was standing on the derrick floor near the gas line endeavoring to obtain a time order from the head driller so that he might receive the compensation due him for said work. At the time of receiving the injuries he was not an employee of the drilling company.

First aid treatment was given him at Rodessa, and thereafter he was carried to the Tri-State Sanitarium in Shreveport where he remained until March 13, 1936. On March 16, 1936, the sum of $250 was paid to him in cash by two representatives of the Employers' Casualty Company, the insurer of said drilling company, and simultaneously therewith he signed and executed a compromise agreement relinquishing all claims and causes of action that he had by reason of the accident. His sanitarium bill was also approved for payment on that date by said representatives.

On June 4, 1936, he commenced this litigation against the Rex Drilling Company, Inc., and its said insurer, under the provisions of article 2315 of the Revised Civil Code, to recover damages for his injuries. In his pleadings he avers the nullity of the aforementioned compromise settlement and seeks to set it aside. Allegations of fact made in support of his attack thereon are summarized in his counsel's brief as follows:

"(a) That on the day of settlement, one Dr. W. S. Harmon, the company's doctor, advised him that his disability would not exceed three weeks (this was changed by supplemental and amended petition from three to five weeks), whereas he is still disabled and will be permanently disabled;

"(b) That he was a wholly uneducated man, unable to read;

"(c) That petitioner did not realize he was signing a full and complete release ex-

culpating these defendants of the serious injury he received in said accident due to his impaired and painful physical and mental condition at that time.

"(d) That defendants would give petitioner a permanent job such as he would be able to do in his debilitated condition.

"(e) He was paid the amount of said settlement in cash, which deprived him of time within which to consult friends and persons in better position to advise him with reference to legal consequences of his act.

"(f) That the paltry sum of $250.00 is wholly and was wholly out of proportion to the amount he was entitled to.

"(g) That the settlement was made on the basis of time lost, or under the Workmen's Compensation Act of Louisiana."

Defendants urge the following defenses to the suit:

(1) That a sufficient ground to annul the act of compromise is neither pleaded nor proved.

(2) That said written agreement has the effect of res judicata and an estoppel.

(3) That no negligence on the part of the drilling company has been proved, as is required in actions in tort brought under Civil Code, article 2315.

(4) That plaintiff was merely a licensee on the premises at the time of the accident, and only the duty of not wantonly injuring him was owed by the drilling company; or, alternatively, he was an invitee, and that the proof shows that ordinary and reasonable care for his safety, to which he was entitled, was furnished him.

(5) That he was contributorily negligent in going upon the derrick floor.

The trial of the case resulted in a judgment sustaining defendants' plea of res judicata, thus upholding the compromise settlement, and rejecting the demands of plaintiff. The district judge gave written reasons for his decision, and therein a lengthy discussion of the testimony relating to the execution of the attacked instrument is furnished. At the conclusion of the opinion he states:

"In passing we will state that while not passing directly on the question of liability, vel non, of the defendant, we are of the opinion that the settlement made is not unconscionable but may be a very advantageous one for plaintiff."

A devolutive appeal was prosecuted by plaintiff.

It is our purpose to first discuss the defense on which the judgment is predicated.

The instrument admittedly signed by plaintiff, and which he herein assails, was passed before a notary public and is in words and figures as follows:

"For and in consideration of the payment to me/us at this time of the sum of Two Hundred Fifty & No/100 Dollars ($250.00), the receipt of which is hereby acknowledged, I/we, being over 21 years of age, do hereby release, acquit and forever discharge Rex Drilling Company of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation, on account of, or in any way growing out of, any and all known and unknown personal injuries and property damage resulting or to result from an accident that occurred on or about the 26th day of January 1936, at or near Rodessa, Louisiana, Caddo Parish, on the Rodessa Oil & Land Company's #2 Well.

"I/we do hereby declare and represent that the injuries sustained are permanent and progressive and that recovery therefrom is uncertain and indefinite, and in making this release and agreement it is understood and agreed that I/we rely wholly upon my/our own judgment, belief and knowledge of the nature, extent and duration of said injuries as well as the liability questions involved, and that I/we have not been influenced to any extent whatever in making this release by any representations or statements regarding said injuries, or regarding liability, or any other matters, made by the persons, firms or corporation who are hereby released, or by any person or persons representing, or acting for him or them, or by any physician or surgeon by him or them employed.

"It is further understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and that the payment is not to be construed as an admission of liability on the part of Rex Drilling Company by whom liability is expressly denied.

"This release contains the entire agreement between the parties hereto, and the terms of this release are contractual and not a mere recital.

"I further state that I have carefully read the foregoing release and know the contents thereof, and I sign the same as my/our own free act."

With reference to the facts leading up to and surrounding the consummation of the settlement in question, the record discloses that Mr. Head, the plaintiff, was a patient at the sanitarium from the date of the accident until Friday, March 13, 1936, during which time he was under the care and attention of Dr. W. S. Harmon, to whom he had been sent by the drilling company. On the latter date, having been informed by Dr. Harmon that further hospitalization was unnecessary but that a few additional treatments would be needed, he obtained lodging at a rooming house, located near the sanitarium, where he was able to be with his family. However, he returned daily to the physician for medical attention which largely consisted in the dressing of wounds on his lower extremities. According to plaintiff, Dr. Harmon told him on Saturday, which was the day following his departure from the sanitarium, that, "the insurance man will be out here to see you Monday."

Shortly before noon on Monday, March 16, 1936, Mr. T. E. Fergusson, the Shreveport representative of the insurer, and Mr. E. C. Summerfeldt, its assistant claims manager whose domicile is in Dallas, Texas, called at the sanitarium and found plaintiff there having his wounds dressed. After this treatment was completed Dr. Harmon escorted all three into one of his small offices so that they might confer and left them. Head was informed that there was no further responsibility on the part of defendants as he had departed from the sanitarium and he was not an employee of the drilling company. Whereupon he stated that he had no funds with which to care for himself and his family. A discussion of the matter of a settlement followed and Fergusson informed plaintiff that the case did not come under the Compensation Law but suggested that $20 per week be used as a basis in attempting to reach an agreement. Dr. Harmon was then called into the conference and his opinion sought with reference to plaintiff's probable future disability. It was his thought that the injured man could return to work in four or five weeks from that date. This estimate was based on the condition of the wounds at the time and the history of similar cases and their progress. After receiving the physician's opinion the parties added the time lost by reason of hospitalization to the estimated future disability, and, using $20 per week as a basis, arrived at a figure of $230 or $240, the testimony on this total

being conflicting. This amount was offered to Head who replied that he would settle for $250. His proposal was accepted by the adjusters. During the conference, Dr. Harmon rendered Fergusson a statement for his services in connection with the patient, and informed them that it covered any additional dressing that he might furnish Head. Also, he told plaintiff that he would thereafter do what he could for him.

The adjusters at the time were unprepared to finally settle the claim, for they had with them neither sufficient cash, drafts nor releases. It is their testimony that plaintiff informed of his desire to receive currency and to leave the city immediately, and that they sought, after reaching the agreement, to cash a check at the sanitarium for $250; however, the funds were not available there. Thereupon Head was told that they would secure the money and bring it to him. The adjusters then left plaintiff at the sanitarium, entered their automobile, and drove several miles to the downtown section of Shreveport. While there they had lunch, went to Fergusson's office and prepared a draft for the $250 and the necessary release to be signed, and walked approximately three blocks to a bank. The draft was drawn by Summerfeldt on the Employers Casualty Company, was payable to Fergusson and carried the endorsement of the payee. After obtaining the desired funds on the draft they began their return trip to the sanitarium. In the meantime Head had gone to his rooming house, and they located him there.

It was desired that the release be executed before a notary public. They made inquiry at the sanitarium and learned that one was usually obtainable at that place, but that at the time he was not available. All three of the parties then entered the car and drove toward the business section of the city. After making an intervening stop they reached the Bewley Furniture Store where a notary public sign was observed. One of the adjusters went inside of that establishment, and was accompanied back to the car by Mr. A. H. Bewley, a notary public, who was a stranger to all of the parties. The $250 in currency was then paid to plaintiff and he executed the compromise act, all in the presence of the notary. The details of this execution will be hereinafter further discussed. Thereafter Head was returned to his rooming house.

After receiving the funds, plaintiff paid his room and board bill and perhaps some

other expenses, and went to visit his mother at Winnfield, Louisiana. His burns had entirely healed, with the exception of a raw place on each leg. However, these carried no infection. For several weeks he attempted to dress his own wounds, and when he next visited Dr. Harmon they were infected.

The following articles, pertinent to a discussion of this case, are found in the Louisiana Civil Code under the title, "Of Transaction or Compromise":

"3071. A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.

"This contract must be reduced into writing."

"3078. Transactions have, between the interested parties, a force equal to the authority of things adjudged. They can not be attacked on account of any error in law or any lesion. But an error in calculation may always be corrected."

"3079. A transaction may be rescinded notwithstanding, whenever there exists an error in the person or on the matter in dispute. It may likewise be rescinded in the cases where there exists fraud or violence."

Also somewhat relevant, and which are cited and relied on by plaintiff's counsel, are the following codal provisions of our substantive law:

"1797. When the parties have the legal capacity to form a contract, the next requisite to its validity is their consent. This being a mere operation of the mind, can have no effect, unless it be evidenced in some manner that shall cause it to be understood by the other parties to the contract. To prevent error in this essential point, the law establishes, by certain rules adapted to the nature of the contract, what circumstances shall be evidence of such consent, and how those circumstances shall be proved; these come within the purview of the law of evidence."

"1812. Express consent must be given in a language understood by the party who accepts, and the words by which it is conveyed must be in themselves unequivocal; if they may mean different things, they give rise to error, which, as is hereinafter provided, destroys the effect of a contract."

"1824. The reality of the cause is a kind of precedent condition to the contract, without which the consent would not have been given, because the motive being that which determines the will, if there be no such cause where one was supposed to exist, or if it be falsely represented, there can be no valid consent."

"1832. In all cases, however, when the information, which would have destroyed the error, has been withheld by the other party to the contract, it comes under the head of fraud, and invalidates the contract."

In our opinion no fraud, misrepresentation or suppression of information was practiced on plaintiff, as he contends, so as to authorize the setting aside, under and pursuant to the aforementioned codal provisions, of the agreement which he entered into. On the contrary, we think that he accepted the benefits provided by the insurance adjusters, viz., the cash and payment of his hospital and physician expenses, and executed the written release, with complete knowledge of the facts attending the accident and injury and full appreciation of the effect of his acts, and without any undue advantage being taken of him.

Although it was not plaintiff's good fortune to obtain a high education, he having completed only the fourth grade in school, his twelve years' work and experience in the oil fields of Louisiana and Texas no doubt furnished him considerable worthwhile training in industrial matters. By reason of that experience, and of the manner in which his testimony was given during the trial, and the phraseology used by him when testifying, we are convinced that he is not the illiterate that he claims to be. On this issue, the trial court observed:

"While it is true that plaintiff is not an educated man, but he is not a man with the mind of a ten-year old child trusting anyone who makes a statement to him."

It is plaintiff's testimony that the written agreement was not read to him before the affixing of his signature. With reference to this, he is flatly contradicted by the adjusters, and by the notary public who passed the act and with whom the parties were not previously acquainted. Mr. Bewley, the notary, testified that after fully reading and explaining the document to plaintiff, he asked if it was understood and an affirmative answer was given. The written opinion of the district judge states:

"We think that the entire statement of plaintiff and that of the adjusters plainly show that the settlement agreement was fully and fairly explained to plaintiff and he knew èxactly the import of the transaction."

The contention is made that Fergusson and Summerfeldt introduced themselves as representatives of the Rex Drilling Company, Inc., when they came to the sanitarium, and promised him a job with that company, in addition to the cash settlement, as an inducement for the obtaining of his signature. The preponderance of the evidence in the record does not support this contention. Furthermore, it is to be remembered that according to plaintiff's own testimony, he was expecting a visit from the "insurance man" on that day.

Neither do we think that fraud was practiced by the adjusters and Dr. Harmon in the computation of the number of weeks for which payment was to be made to plaintiff. The adjusters offered no estimate as to the probable future disability. Dr. Harmon, a reputable physician of Shreveport, was called into the conference, without objection from plaintiff, and his opinion sought on the matter. He thought that the wounds would heal entirely in four or five weeks, considering their status at that time, and we think that his opinion was honestly given. The estimate then placed by plaintiff on his own future disability was seven weeks, or only two weeks more than that of Dr. Harmon.

Plaintiff further contends that the settlement was hurriedly consummated in order to prevent his conferring with others and seeking their advice, and that currency instead of a draft was employed and given in aid of that purpose. We agree with the trial judge that there is no merit in this contention. At least an hour elapsed from the time the adjusters left plaintiff to go for the cash and the necessary release papers until they returned to him. During that period he was free to consult with anyone that he wished. No attempt was made to prevent his talking to any person. Furthermore, it is remembered that he had two days' notice of the intended visit of the adjuster, and this provided sufficient time to seek advice regarding his rights and a proper settlement if he had so desired. Although drafts áre usually given by adjusters in settlement of claims, this primarily because of providing a record of payment for the insurance company, the evi-

dence satisfies us that currency was employed in the instant case as an accommodation and convenience to plaintiff and at his request. It was his desire to obtain a settlement and to leave Shreveport as soon as possible, and he did not wish to lose time through the cashing of a draft.

The further contention is made that plaintiff was under such a physical and mental strain that the significance of his acts was not appreciated by him. No doubt he was considerably worried over his then financial condition, particularly in view of the fact that his wife was an expectant mother, and that he was somewhat weak from his long period of hospitalization. It is his testimony that he fainted on Sunday, preceding the Monday on which the settlement was made, while returning from the sanitarium to his home, and that this fact was communicated to Dr. Harmon and the adjusters; however, they severally deny having received such information. Considering his somewhat weakened and worried condition and assuming that the fainting actually occurred, it does not satisfactorily appear that those factors influenced or had any bearing on his entering into the agreement. He was usually able to walk unassisted from his rooming house to the sanitarium and return, and, as his testimony, discloses, he possessed all of his mental faculties and intelligently discussed the terms of settlement with the adjusters and Dr. Harmon.

The record does not reveal that there was a withholding of information from Head such as would constitute fraud under Civil Code, article 1832, supra. Of course, the insurance company caused an investigation of the accident to be made shortly after its occurrence, as it had the right to do, and a report thereon was delivered to the adjusters; however, it does not appear that the findings were suppressed from or misrepresented to plaintiff. Then, too, it must be remembered that the injured man was admittedly not an employee of the Rex Drilling Company, Inc., at the time, and that he possessed knowledge of the cause and circumstances of his injuries.

We do not find the Louisiana cases relied on by plaintiff's counsel to be decisive of the controversy under consideration. He cites Brandon v. Gottlieb, 16 La.App. 676, 132 So. 283; Reed v. Holderith, 3 La.App. 378, 379; Lampkins v. Vicksburg, S. & P. R. Co., 42 La.Ann. 997, 8 So. 530; Davenport v. F. B. Dubach Lumber Co., 112 La. 943,

36 So. 812. A reading of the opinions in those cases discloses that palpable fraud, concealment of material facts, or deception was practiced in connection with the obtaining of the respective settlements therein sought to be set aside. According to our findings, and those of the district court, none of those elements is here present.

Controversies recently considered by this court which involved attempted annullments of compromise settlements, although not providing identical facts, are Sly v. New Orleans, T. & M. Ry. Co., La.App., 142 So. 276; Beck v. Continental Casualty Co., La.App., 145 So. 810; Brewster v. J. C. Byram & Co., La.App., 149 So. 118. In our opinions in those cases many of the above quoted codal provisions are treated, and the former jurisprudence of this state touching the law applicable to the instant case is reviewed. A similar review is here unnecessary.

As we have found no error in the judgment of the trial court sustaining the plea of res judicata, it is not necessary for us to discuss the other defenses urged.

The judgment appealed from is affirmed.