142 So.2d 613 (1962)
Mrs. Corinne CLOHECY, Widow of Daniel J. WISE
v.
Vester PRESCOTT, Allstate Insurance Company, Harry J. Miller, Jr., New Orleans Public Service Incorporated and Travelers Indemnity Company.
No. 451.
Court of Appeal of Louisiana, Fourth Circuit.
June 4, 1962.
Rehearings Denied July 2, 1962.
*614 John P. Dowling and Calvin H. McBride, New Orleans, for plaintiff and appellee.
Alvin R. Christovich, Sr. and William W. Ogden, New Orleans, for New Orleans Public Service, Inc. and Harry J. Miller, Jr., defendants and appellants.
Sessions, Fishman, Rosenson & Snellings and Curtis R. Boisfontaine, New Orleans, for Vester Prescott and Allstate Ins. Co., defendants and appellants.
Before McBRIDE, SAMUEL and JOHNSON, JJ.
McBRIDE, Judge.
On the afternoon of May 25, 1958, a passenger bus of the New Orleans Public Service, Inc., operated by its employee, Miller, which was proceeding on North Miro Street in an uptown direction, was run into by an automobile, operated by Prescott and insured by Allstate Insurance Company, which was traveling toward the lake on St. Roch Avenue, the collision occurring in the intersection formed by North Miro Street and the outbound traffic roadway of St. Roch Avenue. Plaintiff, aged 74, a passenger on the bus, was physically injured, and she brought this suit against the owner of the bus, Miller, Prescott, and Allstate Insurance Company, in solido, seeking to recover a large sum in damages on the allegations that Both Miller and Prescott were guilty of joint negligence which proximated the accident.
After a trial, by jury, which consumed four full days, a verdict was returned in favor of plaintiff against the bus company, Miller, and Prescott for $11,024.50 and against Allstate Insurance Company in the sum of $5,000 (the maximum of its liability under the policy covering the automobile driven by Prescott), and judgment was *615 rendered accordingly. All four defendants prefected appeals.
Prescott and Allstate Insurance Company in answer first tender the defense they had entered into a transaction or compromise with plaintiff under which defendant-insurer paid her $105, in consideration of which she executed a full release of all of her claims against them. Plaintiff at a later date attempted to return the amount to the insurer, but tender was refused. Said defendants now contend vigorously that the compromise they entered into with plaintiff is a complete bar to any claims she makes against them.
Plaintiff in her petition alleged that there had been a pretended adjustment and settlement of her claims as against Allstate Insurance Company and its assured, which fact she learned from her counsel when he demanded and received from the insurer a photostatic copy of the release. She avers the compromise was effected through deceit, imposition, misrepresentation, suppression of pertinent facts and information that should have been known to her, and at a time when she was not sufficiently possessed of her mental faculties to enable her to exercise the same care and prudence in connection with her signing of the release as she would have under ordinary circumstances. She prayed that the release be set aside. The jury evidently believed the compromise to be null and void, for it ignored the release and brought in its verdict against all defendants. The judgment subsequently rendered makes no mention of the release.
Whereas Allstate Insurance Company and Prescott are standing squarely on the compromise and the release given by plaintiff as a bar to her demands, it is necessary now to determine the validity vel non thereof.
Immediately after the accident, plaintiff was conveyed to the Charity Hospital where certain X-rays were made and she was given some medication to alleviate pain. She was returned to her home the same evening suffering "with my head" and the pills "made me a little woosy, like." She states that the next morning she was sore "all over," and that her back, hips, legs and one eye were black and blue and that the left side of her face was swollen. She did not take to bed but reclined in an easy chair. In the afternoon Kollin, an adjuster for Allstate Insurance Company, went to plaintiff's apartment and was admitted by a Mrs. Carver, a neighbor of plaintiff who was present in the apartment in order to give such assistance as she could to plaintiff. At the time of Kollin's call plaintiff had not received treatment for her injuries (except having ingested the pain-killing pills received from the hospital) as she did not see her physician (Dr. Drewes) until May 28, 1958. After some conversation between the adjuster and plaintiff, it was agreed that she would be given $105. She testified that the adjuster asserted he represented Prescott who felt sorry for her, and that he was giving her the money on behalf of Prescott in order to help her out in the matter of payment for the X-rays and any additional medical bills. She admits receiving a check and signing the release, but pretends that she did not know the nature of the document or that she received the money from the insurance company. She states that her glasses had been broken in the accident and that without them she could not see, and therefore did not know the contents of the document.
In a number of cases compromise agreements entered into by persons who had suffered damages have been annulled by our courts. As in the case of fraud, each case must depend upon its own peculiar facts and circumstances. There are cases wherein it has been held that bereavement and grief, coupled with receipt of an unreasonably small amount, when it is obvious that the mental condition of the one receiving does not permit of rational and clear thinking, or where the receiver could not read or write or could not speak or understand the English language and did *616 not understand the nature of the documents he signed, are enough to warrant the rescinding of the contract. Davenport v. F. B. Dubach Lumber Co., 112 La. 943, 36 So. 812; Waagen v. Indiana Lumbermens Mutual Insurance Company, La.App., 136 So.2d 831; McDaniel v. Audubon Insurance Company, La.App., 121 So.2d 531; Lervick v. White Top Cabs, Inc., La.App., 10 So.2d 67; McCastle v. Architectural Stone Co., La.App., 4 So.2d 120; Davis v. Whatley, La.App., 175 So. 422; Galt v. Travelers' Ins. Co., La.App., 141 So. 105; Brandon v. Gottlieb, 16 La.App. 676, 132 So. 283; Reed v. Holderith, 3 La.App. 378.
The adjuster denied making any false representations or telling plaintiff the money came from Prescott as a gift. He stated that plaintiff seemed to fully understand everything that was said and that before signing, she held the release in front of her as though she were reading it.
We have very carefully examined the testimony and our conclusion is that plaintiff, though an elderly woman, was an intelligent person who, despite her injuries, was fully capable of understanding the nature and import of such a transaction, and we fail to discern any grounds upon which the compromise should be set aside. She was mentally alert enough to inquire of the adjuster whether her acceptance of the money would adversely affect her case and she signed the release only when she was assured it would not. Her denial that she knew the settlement was coming from the Allstate Insurance Company is not impressive, and we believe plaintiff understood the reason for the payment to her and by whom the payment was being made. She received and cashed the insurer's check. The adjuster states that he drafted a restricted release so that plaintiff's rights against the other two defendants would be preserved.
A transaction or compromise is an agreement between two or more persons who, for for preventing or putting an end to a lawsuit, adjust their differences by mutual consent in the manner which they agree on and which every one of them prefers to the hope of gaining, balanced by the danger of losing. LSA-C.C. art. 3071. According to LSA-C.C. art. 3078 a voluntary compromise agreement, lawfully consummated, has the force of a definitive judgment in such transaction.
In Russ v. Union Oil Co., 113 La. 196, 36 So. 937, the Supreme Court said:
"There is no rule of law, morals, or ethics which denies to the ordinary citizen the right to compromise, with the person asserting it, a claim against him for damages, nor is that right defeated by any previous employment of counsel to prosecute such claim; and, when the compromise is effected in the manner provided by law, it has the force of the thing adjudged, and cannot be attacked collaterally, or for error of law or lesion, in a direct action. * * *"
The law on the subject of compromise as above detailed is also expressed in Jackson v. U. S. Fidelity & Guaranty Co., La.App., 199 So. 419; Head v. Rex Drilling Co., Inc., La.App., 182 So. 380; Beck v. Continental Casualty Company, La.App., 145 So. 810. In the latter case the court discussed the binding effect of a compromise thus:
"The law in its wisdom, and out of a solicitude to end or avert threatened litigation, encourages the settlement of disputes by compromise, and does not sanction the solemn acts of contending parties settling their disagreements being lightly brushed aside, unless there be present evidence of bad faith, error, fraud, etc. If such were not the law, there would be little incentive to any one to part with anything of value in the desire to escape the harassments of litigation. A compromise agreement, when freely entered into, is intended to have the binding effect of the thing adjudged. The law has ordained that such transactions have the dignity and force of a definitive judgment, in so far as definitely and irrevocably fixing the *617 rights and liabilities of the parties thereto, as relates to the subject-matter dealt with. It is simply the act of the parties determining their own liabilities and obligations, instead of the court."
If the asserted ground of annulment that plaintiff did not know it was a release she was signing is to be upheld in this case, then we say that in almost every case the compromise could be subsequently avoided merely on the representation of the plaintiff that he did not know he was relinquishing his claim. Releases speak for themselves and the mere assertion that the document was not read constitutes neither an acceptable defense nor a reasonable excuse where the plaintiff is literate and intelligent and could have read and easily understood the contents of the document he signed. Tooke v. Houston Fire & Casualty Insurance Company, La.App., 122 So.2d 109, and Blades v. Southern Farm Bureau Casualty Insurance Company, La.App., 95 So.2d 209. Mrs. Carver, plaintiff's neighbor and friend, was present during all the negotiations with the adjuster, and if it is true plaintiff could not read the document without her spectacles, she should have had Mrs. Carver or the adjuster read it to her.
It is conceded that Prescott by ignoring the stop sign which confronted him at the North Miro Street intersection was negligent with respect to the collision, but the liability of himself and the insurer has passed out of the case in view of the compromise entered into and the release of plaintiff's claims as against said two defendants.
The other two defendants, Miller and New Orleans Public Service, Inc., are also seeking to take advantage of the compromise and plaintiff's release of her claims. They point to that part of LSA-C.C. art. 2203 which provides:
"The remission or conventional discharge in favor of one of the codebtors in solido, discharges all the others, unless the creditor has expressly reserved his right against the latter."
Joint tort-feasors are governed by this same rule as there is but one debt and they are liable in solido for the damages inflicted by them. Guarisco v. Pennsylvania Casualty Co., 209 La. 435, 24 So.2d 678.
It is contended that when discharging Prescott and Allstate Insurance Company plaintiff made no express reservation of her right as against New Orleans Public Service, Inc., and Miller, and under the provisions of LSA-C.C. art. 2203 the latter two defendants are as well discharged.
The release executed by plaintiff reads in part as follows:

"RELEASE OF ALL CLAIMS
This Indenture Witnesseth that, in consideration of the sum of one hundred & five & no/100 Dollars ($105.00), receipt whereof is hereby acknowledged, for myself and for my heirs, personal representatives and assigns, I do hereby release and forever discharge the Allstate Ins. Co. & Vester Prescott only and any other person, firm or corporation charged or chargeable with responsibility or liability, their heirs, representatives and assigns, from any and all claims * * *."
While LSA-C.C. art. 2203 provides that all of the codebtors in solido are discharged by the remission unless the creditor has expressly reserved his right against those not intended to be discharged, the article makes no provision for any specific form of reservation. It has been held there is nothing sacramental about the form, and since no one is presumed to renounce a right unless it clearly appears that he intends to do so, it suffices that the intention to reserve a right against codebtors may be inferred from any expression in the release which negatives the intention to release them. Williams v. DeSoto Bank & Trust Co., 189 La. 245, 179 So. 303; Landry v. New Orleans *618 Public Service, Inc., 177 La. 105, 147 So. 698; Cusimano v. Ferrara, 170 La. 1044, 129 So. 630.
We have already mentioned that in accepting payment plaintiff was apprehensive lest her case would be affected, and the adjuster informed her that it would not, which is a clear indication that in executing the release it was not plaintiff's intention to relinquish or remit her claims against New Orleans Public Service, Inc., and the bus driver, and to that end the adjuster in his own handwriting wrote in and underlined the word "only" after the names of Allstate Insurance Company and Prescott appear in the release. We think it manifest from the conduct of the parties and the manner in which the release was confected that there was, on the part of plaintiff, such a reservation as is contemplated by LSA-C.C. art. 2203 as to any claims she may have had against the codebtors.
We shall now proceed to a determination of whether there was negligence on the part of the bus driver. The intersection was controlled by a stop sign on St. Roch Avenue facing Prescott and by a slow sign on North Miro Street. While the City Traffic Engineer, under Ordinance No. 828, M.C.S., Code of the City of New Orleans, 1956, as amended, is charged with the installation and proper timing and maintenance of traffic control devices, it is not set forth in the ordinance what is required of a motorist when he is confronted by a slow sign.
When 30 feet from the intersection, the bus driver looked to his left (the direction from which Prescott's automobile came) and seeing no traffic approaching reduced the speed of the bus from 20 to 15 miles per hour and entered the intersection. Miller did not become aware of the presence of the Prescott vehicle until he was halfway across and sighted it out of the corner of his eye.
If Miller actually looked to his left when the bus was 30 feet before reaching the intersection, we cannot understand why he did not observe the approaching automobile. The rule of law is that a motorist is presumed to see that which he could have and ought to have seen and that his failure to see is tantamount to not having looked at all. Mansfield v. Toye Bros. Yellow Cab Co., La.App., 78 So.2d 544, and cases therein cited.
Seven passengers who rode in the bus were called as witnesses on behalf of the New Orleans Public Service, and Miller and five of these say they saw Prescott's vehicle. According to Ball, when the front part of the bus was just about at the intersection, he noticed the automobile which was then about 4 or 5 feet from the intersection, and that it was going at a normal speed. Ball's statement that he knew there would be an accident is significant. Gonzales saw the automobile when the bus was about to enter the intersection. Steel's testimony is that the bus was already in the intersection when he saw the approaching car which was then 20 or 25 feet away. He estimated the speed of the car to be 20 miles per hour. Domino states the car was passing the stop sign when the bus operator applied his brakes. Stevens observed the car when the bus was 10 feet from the intersection and that it was about 25 feet away.
It is argued that Miller was justified in driving the bus into the intersection under the circumstances. Counsel point to certain jurisprudence to the effect that a motorist who is proceeding on a through street, or a street which is protected by stop signs on intersecting streets requiring vehicles thereon to stop before entering the intersection, has the right to believe and to assume that the law will be obeyed and that the vehicle being operated on the less-favored street will be brought to a stop in obedience to the sign.
In several cases in our jurisprudence appellate courts were concerned with slow signs. In Boudra v. Williams, La.App., 17 So.2d 502, the court said such sign is intended to be a warning to drivers of vehicles of the danger which might be encountered. *619 The court in Prudhomme v. Continental Casualty Co., La.App., 169 So. 147, observed that a sign marked "Cross Roads" should have impressed a motorist that not far ahead was an intersection and his vigilance should have been quickened thereby to meet any contingency that might arise. In Battalora v. Carnahan Creamery, La.App., 157 So. 612, our predecessors said that the purpose of the then prevailing City Ordinance was to require that vehicles on reaching a slow sign should be moving at a speed sufficiently slow to permit of their being immediately stopped upon the first manifestation of danger. See, also, Finkelstein v. United States Fidelity & Guaranty Co., La. App., 184 So. 219; Borman v. Lafargue, La.App., 183 So. 548; Bacher v. Higgins, La.App., 157 So. 800; 164 A.L.R. p. 109, note 4.
The rule in regard to a stop sign is that when a motorist stops in obedience thereto, he performs but one half the duty imposed upon him, and he is further required, before starting forward, to make careful appraisal of traffic conditions in the intersection and to refrain from proceeding in the face of obvious or possible danger; otherwise he is deemed guilty of gross negligence. Anderson v. Morgan City Canning Co., La.App., 73 So.2d 196, and the many cases cited therein.
We think that a commensurate rule should have application in the case of a slow or caution sign. Such sign should serve as a warning that the locus is hazardous or unusual and that the motorist must exercise vigilance and prudence. It will not do for the motorist to diminish his speed and then enter the intersection without looking and seeing. Reducing speed is only a partial fulfillment of the duty. Before entering the intersection, he should acquaint himself with prevailing traffic conditions thereat and therein and act accordingly.
Miller should have seen no less than his passengers saw and had he seen the Prescott vehicle as they did, he, as a reasonably prudent man, certainly should not have proceeded forward in view of the close proximity of the Prescott car which indicated that Prescott could and did not intend to stop in obedience to the sign. The passenger Ball knew there was going to be a collision.
In Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292, the Supreme Court tersely said:
"* * * And it can not and will not be disputed that a motorist can not, in the face of imminent danger, rely upon the right of way accorded him by law. * * *"
While the motorist on the right of way street may indulge in the assumption that vehicles on intersecting streets will be stopped in obedience to stop signs, he can do so only until he sees or should see that the other car has not observed or is not going to observe the law. Koob v. Cooperative Cab Co., 213 La. 903, 35 So.2d 849.
It has been held by our courts many times that the superior right which is accorded vehicular traffic on a preferred thoroughfare is not an invitation to negligence and does not relieve drivers from the results of their negligence. On the contrary, the superior right of way is forfeited by the negligence of a driver, and among the most common acts of negligence which are unexcused by such preferred right is failure to maintain a proper lookout. Lampkin v. United States Fidelity & Guaranty Co., La. App., 99 So.2d 147; Washington v. Dawes, La.App., 90 So.2d 150; Wilson v. Yellow Cab Co of Shreveport, Inc., La.App., 64 So. 2d 463; Hickerson v. Southern Farm Bureau Casualty Insurance Company, La.App., 77 So.2d 124.
The mere showing of injury to a fare-paying passenger on a public conveyance and his failure to reach his destination safely establishes a prima facie case of negligence and imposes the burden on the carrier of convincingly overcoming such case. *620 Adams v. Great American Indemnity Company, La.App., 116 So.2d 307; Johnson v. Continental Southern Lines, Inc., La.App., 113 So.2d 114, 74 A.L.R.2d 1328; Coleman v. Continental Southern Lines, Inc., La.App., 107 So.2d 69; Peters v. City of Monroe, La. App., 91 So.2d 428.
A public carrier of passengers while not an insurer is required to exercise the highest degree of vigilance, care, and precaution for the safety of those it undertakes to transport and is liable for the slightest negligence. Gross v. Teche Lines, Inc., 207 La. 354, 21 So.2d 378. The carrier must do all that human sagacity and foresight can do under the circumstances, in view of the character and mode of conveyance adopted, to prevent injury to passengers, the carrier being held liable for the slightest negligence with reference to the exercise of such care. Mire v. Lafourche Parish School Board, La., 62 So.2d 541.
We have no doubt at all that the bus driver through the exercise of such care as would be expected of a prudent person could have avoided the accident.
Miller testified that when the accident happened plaintiff fell over the front seat of the bus and passengers assisted her back to her seat.
Plaintiff placed herself under the charge of Dr. Everett L. Drewes, a general practitioner, on the third day after the accident and his initial diagnosis was general contusions and bruises which have heretofore been alluded to. However, complications developed, and the uncontradicted evidence shows that plaintiff remained under Dr. Drewes' care for about thirty-three months and that during that period he saw her about thirty times.
Plaintiff had been a patient of Dr. Drewes since January 1958 for a kidney condition called pyelonephritis which he described as a bacterial infection, the focal point of which was in the urinary tract.
By June 9, 1958, the bruises and contusions had healed, but Dr. Drewes noted a deterioration of plaintiff's condition resulting from the infection of the kidneys and he recommended that she be taken to the Charity Hospital, where she remained for sixteen days, the diagnosis being acute pyelonephritis. Subsequently she was given a blood transfusion at Mercy Hospital.
After plaintiff's return from the hospital, Dr. Drewes resumed his treatment. He states plaintiff's feet were swollen; she was tired, pale and weak and had anemia caused by drugs administered at the hospital. Dr. Drewes was of the opinion that her prognosis was good at the time of the trial.
There is much contention pro and con whether the pre-existing kidney infection was aggravated or worsened as a result of the injuries, and for answer to the question we can only resort to the testimony of Dr. Drewes and Dr. Gilbert Tomskey, a urological surgeon, who never examined plaintiff but who appeared in court as a medical expert on behalf of defendants for the purpose of answering a series of hypothetical questions.
Dr. Drewes states the kidney infection became worse after the accident, and he was positive that the injuries were the cause. To quote his words:
"Yes, I mentioned she had a bruised area in the lumbar area and I was of the opinion she was not able to take care of herself and the two facts together that she didn't get the proper couldn't get the proper care at home plus the fact that she had the injuries aggravated the pyelonephritis."
Dr. Tomskey did not deny that trauma could aggravate the pyelonephritis. He testified:
"Q. Hypothetically, if you have a kidney suffering from pyelonephritis, would not a trauma to the kidney tend *621 to aggravate it and spread it and make it worse?
"A. Yes, I take it that in that case you have a proven trauma injury to the kidney. In view of the infection present, you would expect that person to have a more severe involvement of the kidney than without it.
* * * * * *
"Q. * * * I believe your answer to Mr. Ogden's question was the kind of accident described, if the body had struck a corner of the seat it could conceivably cause the traumatic injury to the kidney?
"A. If it's struck in the area."
We feel that the jury had a sufficient basis upon which to found its conclusion that plaintiff's condition had been aggravated.
Plaintiff seemed to have been a quite active person, taking her place in church organizations; while an old-age pensioner, she augmented her income by babysitting for the neighbors. Dr. Drewes states that she was incapacitated for six months and also partially incapacitated for a like period. Plaintiff testified that she had been placed on the Dangerously Ill List of Charity Hospital, but we do not see any notation in her hospital chart to that effect. She also states she received the last sacraments of her church.
We have studied the record pertaining to her expenses which could have been caused by the infliction of the injuries and we can at the most find where she spent $475.50. We have no way of knowing how much loss of income she sustained by being incapacitated from her babysitting pursuits.
The jury allowed her $11,024.50, but we are at a loss to know how they arrived at that amount. However, our opinion is that the award is excessive, and we think that an award of $7,500 would do substantial justice in the case and amply compensate plaintiff for the personal injuries, expenses, and whatever loss of income she suffered. However, said amount should be credited with the sum of $105 which she received from the Allstate Insurance Company by virtue of the compromise. See LSA-C.C. art. 2203.
For the reasons assigned, the judgment insofar as it runs against Allstate Insurance Company and Vester Prescott be reversed, and plaintiff's claims as against said two defendants be dismissed at her cost in both courts; the judgment against New Orleans Public Service, Inc., and Harry J. Miller, Jr., he reduced to the sum of $7,395, and as thus amended, and in all other respects, the judgment is affirmed. Costs of the appeals taken by New Orleans Public Service, Inc., and Harry J. Miller, Jr., are to be borne by them.
Reversed in part; amended and affirmed in part.