HOOD, Judge.
The plaintiff in this tort action, Mrs. Earline Richard Robin, claims damages for personal injuries which she sustained as the result of a two-car motor vehicle collision.[1] One of the automobiles involved in the collision was owned by Ernest Richard and was being driven by his wife, Mrs. Felicia Arnaud Richard. Plaintiff was riding as a passenger in that vehicle. The other automobile was owned by C. H. Boeh-mer Sales Agency and was being driven by Richard H. Boehmer. This suit was instituted against Southern Farm Bureau Casualty Insurance Company, the insurer of the Richard automobile, and against C. H. Boehmer Sales Agency, Richard H. Boeh-mer and American Insurance Company, the latter being the insurer of the Boehmer automobile.
The last three named defendants answered and filed a third party petition against Ernest Richard, Felicia A. Richard and Southern Farm, demanding judgment against said third party defendants for one-half the amount which the third party plaintiffs may be condemned to pay.
Three other damage suits arising out of the same accident also were instituted, and they have been consolidated with the instant suit for the purposes of trial and appeal. We *474 are deciding all of these companion suits on this date. See American Insurance Company v. Richard, La.App., 212 So.2d 481; Richard v. American Insurance Company et al., La.App., 212 So.2d 483; and Richard v. American Insurance Company, La.App., 212 So.2d 484.
In the instant suit judgment was rendered by the trial court in favor of plaintiff and against Southern Farm Bureau Casualty Company for the sum of $3772.61. The judgment also decreed that plaintiff’s demands against the remaining defendants are rejected. Appeals from that judgment were taken by plaintiff and by the defendant who was cast in judgment, Southern Farm Bureau Casualty Insurance Company.
The accident which caused plaintiff to suffer these injuries occurred at 11:45 a. m. on August 18, 1965, at the intersection of Willow Street and U.S. Highway 167, in the City of Lafayette, Louisiana. Both of these streets are wide, level, straight thoroughfares, and they are hard-surfaced with concrete at that intersection. The weather was clear and the streets were dry at the time the accident occurred.
Highway 167 is a four lane, divided highway, running generally north and south. The two northbound lanes of traffic on that highway are separated from the two southbound lanes by a wide neutral ground, the neutral ground being 800 feet wide at the place where the accident occurred. Highway 167 is heavily travelled and is known as the Evangeline Throughway. It is the right-of-way or preferred street at that intersection. The legal speed limit for vehicles travelling on that highway is 70 miles per hour.
Willow Street also is a four lane, divided highway. It runs generally east and west, the two* eastbound lanes being separated from the two westbound lanes by a substantial neutral ground,, although the neutral ground on that street is not as wide as is the one on Highway 167. Willow Street is the inferior street at that crossing. Stop signs were located at that intersection warning motorists on Willow Street to stop before proceeding to cross Highway 167. A motorist travelling west on Willow Street toward this intersection is confronted first with a stop sign directing him to stop before proceeding to cross the northbound traffic lanes of Highway 167. After crossing those lanes and continuing to travel west on Willow, the motorist is then confronted with another stop sign directing him to stop before proceeding to cross the southbound lanes of traffic on the highway.
Immediately prior to the time this accident occurred Boehmer was driving his automobile south on Highway 167 at a speed of about 60 or 65 miles per hour. He reduced his speed to 50 or 55 miles per hour as he approached the intersection of that highway with Willow Street. He testified that when he was about 400 feet from the intersection he noticed the Richard car approaching the crossing from his left, that it was travelling west on Willow Street, and that it had traversed about one-half the distance between the northbound and the southbound lanes of traffic on the highway when he first observed it. He stated that the Richard car appeared to be under control, that its speed was being reduced, that he knew there was a stop sign directing the driver of that car to stop before proceeding into his lane of traffic, and that there was nothing which would indicate to him that the driver of the Richard car did not intend to stop.
Boehmer testified further that when he reached a point about 100 feet from the intersection he noticed that the driver of the Richard car began accelerating her speed, and he then ascertained for the first time that she either did not intend to stop or would be unable to do so before she reached the crossing. He stated that he applied his brakes immediately and caused his tires to skid on the highway, but that he was unable to avoid a collision.
The evidence shows that the tires on the Boehmer car skidded a distance of 62 feet four inches immediately prior to the impact. The two automobiles collided with consider *475 able force, and the occupants of both cars were injured.
As we have already noted, Mrs. Richard was driving the car which was travelling west on Willow Street. Two passengers, plaintiff and Miss Sandra Ann Zeringue, were in the car with her at the time the accident occurred. Mrs. Richard testified that she stopped before she proceeded to cross the northbound lanes of traffic on Highway 167, that when she reached a point about halfway between the northbound and southbound lanes of traffic she saw a state trooper's car parked several hundred feet ahead of her car on Willow Street, and that she saw a stop sign directing her to stop before proceeding to cross the southbound lane of traffic on Highway 167. She stated, however, that she has no recollection of any other facts relating to the manner in which the accident occurred. She does not remember whether she stopped before proceeding to cross the southbound lanes of traffic on Highway 167, whether she saw the Boehmer car approaching or the rate of speed at which she was driving. Neither of the two passengers who were in the Richard car with the driver could recall or testify as to any facts at all relating to the manner in which this accident occurred.
Donald Calais, a state trooper, was parked about 150 feet west of the intersection when the collision occurred. He was observing both cars as they approached the crossing. He testified that the Richard car stopped before crossing the northbound lanes of traffic on Highway 167, and that after proceeding through that intersection the front end of her car was “slightly elevated,” indicating that she was accelerating her speed. He stated that when that car reached a point about halfway between the two lanes of traffic it “leveled off” as though the driver had taken her foot off the accelerator, that the front end of the car raised up again momentarily and that shortly thereafter it made a “nose dive,” indicating that the brakes on the car had been applied with some force. Trooper Calais stated that he then looked in a northerly direction and saw the Boehmer car approaching from the north at a distance of about 400 feet. He then looked back at the Richard car and saw it accelerate again, go through the stop sign without stopping and collide with the Boehmer vehicle. He estimated the speed of the Richard car at 45 miles per hour before it “leveled off” and at 30 miles per hour when the brakes were applied. He felt that the speed of that car was increased again to about 45 miles per hour by the time the collision occurred. He stated that the Richard car was about 60 or 70 feet from the crossing when the driver began to accelerate her speed the last time.
On these facts, the trial judge concluded that the sole proximate cause of the accident was the negligence of Mrs. Richard in failing to observe and obey the stop sign at the intersection of Willow Street and the southbound lane of traffic on Highway 167. He also concluded that Boehmer was freé from negligence.
Appellants contend primarily that the trial judge erred in holding that Boehmer was free from negligence. They contend that he was negligent in operating his automobile at a speed greater than was reasonable and prudent under the circumstances and in failing to maintain a proper lookout.
A motorist on a right of way street, with knowledge of the location of a stop sign on the intersecting inferior street, has the right to assume that any driver approaching the crossing from the less favored street will observe the law and bring his car to a complete stop before entering the intersection, and the motorist on the favored street can indulge in this assumption until he sees or should see that the driver of the other car has not observed or is not going to observe the law.[2]
*476 The law also is settled that a motorist on a right-of-way street, upon approaching an intersection where drivers of vehicles on the inferior street are required to stop before entering the crossing and are warned by stop signs to come to a complete stop before entering the intersection, should not be held to the same degree of care and vigilance as would be required of him if no such ordinance were in effect or if no stop signs had been erected.[3]
In the instant suit the evidence shows that when the accident occurred Boehmer was travelling on a through highway at a speed which was substantially less than the legal speed limit of 70 miles per hour. We think he was travelling at a reasonable rate of speed. He had the right to assume that the driver of the Richard car would stop in obedience to the stop sign before she proceeded to cross the southbound lane of traffic on Highway 167. We find, as did the trial judge, that prior to the time Boehmer reached a point about 100 feet from the intersection there was nothing in the way the Richard car was being driven which reasonably should have indicated to him that the driver of that car did not intend to stop at the crossing. When it did become apparent to him that Mrs. Richard did not intend to stop it was too late for Boehmer to avoid a collision. We agree with the trial judge that Boehmer acted reasonably in attempting to avoid an accident after it reasonably became apparent to him that the driver of the Richard vehicle did not intend or would not be able to stop before crossing Boehmer’s lane of traffic.
Plaintiff argues, however, that Boehmer had the last clear chance to avoid the accident, and that he thus is liable for the damages sustained by plaintiff.
A litigant relying upon the doctrine of last clear chance has the burden of proving all facts and circumstances essential to its application. These facts must be proved. They will not be presumed.[4] In order for the doctrine of last clear chance to apply, the plaintiff must establish: (1) That plaintiff was in a position of peril of which he was unaware or from which he was unable to extricate himself; (2) that defendant actually discovered or should have discovered plaintiff’s peril; and (3) that at the time defendant actually discovered or should have discovered plaintiff’s peril defendant had a reasonable opportunity to avoid the accident.[5]
In the instant suit the evidence shows that Boehmer was about 100 feet from the intersection when it first became reasonably apparent to him that the Richard vehicle would not stop before proceeding to cross his lane of traffic. He immediately applied his brakes and caused the tires on his car to skid almost two-thirds that distance in an attempt to avoid the accident. We are convinced that Boehmer became apprehensive of the danger as soon as he reasonably could be expected to do so, and that thereafter he exercised reasonable care in attempting to avoid a collision. Plaintiff has failed to establish, therefore, that Boehmer had a reasonable opportunity to avoid the accident after he discovered or should have discovered plaintiff’s peril. The third element of proof which is essential for the application of the doctrine of last clear chance is lacking, therefore, and we agree with the trial judge that Boehmer did not have the last clear chance to avoid this accident.
*477 Our conclusion is that the sole proximate cause of the accident was the negligence of Mrs. Richard in failing to yield the right of way to Boehmer at this intersection. We agree with the trial judge that Boehmer was free from negligence.
Plaintiff contends next that defendant, Southern Farm Bureau Casualty Insurance Company, waived its policy limits by failing to invoke an interpleader or concursus proceeding, and that the trial judge erred in holding that the whole of the payments which the insurer made in settlement of other claims arising out of the same accident could be deducted from the total insurance fund originally available for all claimants, leaving only the remainder available for plaintiff in the instant suit.
The evidence shows that the policy issued by Southern Farm covering the Richard automobile provided for limits of liability of $5,000.00 for one person and $10,000.00 for each accident. Prior to the trial of this case Southern Farm entered into compromise settlements of three other claims for damages arising out of the same accident. Pursuant to these compromise settlements, that insurer made the following payments:
Richard Boehmer, for personal in-
juries. $2825.00
American Insurance Company,
reimbursement of workmen’s
compensation benefits paid to
Boehmer. 720.39
Sandra Ann Zerangue, person-
al injuries. 2682.00
Total $6227.39
In the instant suit the trial judge concluded that Southern Farm was entitled to deduct from the total insurance fund available the full amount paid in each of these compromise settlements, thus reducing its obligations to plaintiff or any other claimant under the policy, because of the same accident, to the remaining sum of $3772.61. Judgment thus was rendered in favor of plaintiff for this remaining balance.
Plaintiff contends that the trial judge erred in reaching this conclusion. It is argued that Southern Farm was under a duty to provoke an interpleader or con-cursus proceeding in order that a judicial determination could be made as to the portion of the $10,000.00 insurance fund each claimant is entitled to recover, and that the failure of the insurer to provoke such a proceeding constitutes a waiver of its policy limits, at least to the extent of subjecting the insurer to additional liability up to the maximum limit of $5,000.00 per person.
Our attention has been directed to the Louisiana direct action statute, LSA-R.S. 22:655, which provides that “all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable.” And it is argued that that statute accords to a claimant under a liability policy a “fixed right” in and to the insurance proceeds which vests at the moment of the accident, and which right cannot be defeated or diminished by subsequent actions of the insured or insurer. The cases of West v. Monroe Bakery, 217 La. 189, 46 So.2d 122 (1950); and Futch v. Fidelity & Casualty Company, 246 La. 688, 166 So.2d 274 (1964), are cited as authority for that argument.
Plaintiff’s position, as we understand her argument, is that all of the valid claims to the $10,000.00 insurance fund became “proportionately fixed” at the moment of the accident, and that the action of the insurer in voluntarily paying some of these claims could not have the effect of reducing the proportion of the total insurance fund to which any other claimant is entitled. It is argued that a disproportionately low settlement made with one claimant would make available to remaining claimants a larger sum which they would share proportionately, but that a disproportionately high settlement made with one claimant would not reduce the proportionate amount which each of the remaining claim *478 ants would have been entitled to receive before the settlement was made.
It is argued that the settlement which Southern Farm made with Boehmer was disproportionately high when compared to plaintiff’s claim. Plaintiff contends that Boehmer was paid substantially all of the damages which he sustained, that the injuries sustained by plaintiff are much more serious than were those sustained by Boeh-mer, that “the judgment value of plaintiff’s claim is in excess of three times the judgment value of the Boehmer claim,” and that if an interpleader or concursus proceeding had been provoked Boehmer would have received less than the amount paid to him while plaintiff would have received more than the amount awarded to her. She contends that her injuries were of such a serious nature that her proportionate share of the insurance fund should be fixed at $5,000.00, that being the maximum coverage for one person, and that the award made to plaintiff in the instant suit thus should be increased to that amount.
All parties agree that this question is res nova in Louisiana, although it has been considered and determined in other jurisdictions.
The general rule of law applied in other states is that an insurer, in good faith, may enter into compromise settlements with and pay some of the claimants for damages arising out of one accident, even though such payments exhaust the policy limits of liability so that the remaining claimants have no recourse against the insurer.
The applicable rule is stated in 29 A Am. Jur., Insurance, Section 1589, as follows:
“It has been generally held that a liability insurer can settle with some claimants although to do so may exhaust the insurance fund or so deplete it that a subsequent judgment creditor is unable to collect his judgment in full from the remaining proceeds.”
In 8 Appleman, Insurance Law and Practice, Section 4892, we find the following statement:
“If an insurer acts in good faith, it has been held to have the right to settle claims not in the process of litigation, even though such payments exhaust the policy limits of liability so that a judgment creditor has no recourse against the insurer.”
The following observation was made in Blashfield Automobile Law and Practice:
“An insurance company which has issued an automobile liability policy, the coverage of which is limited as to amount, may settle some of the multiple claims arising from an accident although it exhausts the fund to which an injured person whose claim has not been settled might otherwise look.”
“While a ' nonjudgment claimant'may have standing to maintain a proceeding directing a liability insurance company to show cause why it should not be restrained from consummating a settlement with another claimant, in order to protect his chance or recompense under a limited liability policy, the insurance company, whose policy permits it to make such settlements as it deems expedient, will not be restrained, in the absence of a showing of bad faith, from settling the claim of another.” (8 Blashfield Automobile Law and Practice, Section 343.8.)
An annotation in 70 A.L.R.2d 416, 423, Section 5, contains the following statement of the general rule:
“Occasionally, liability insurers have in good faith settled with some claimants and by so doing have reduced the available insurance proceeds to an amount inadequate to pay, in full, judgments subsequently obtained by other claimants. In such cases, the courts have generally held that the insurer was liable to the judgment creditors only for the amount that its total liability exceeded the settlements made.”
*479 And, in Alford v. Textile Insurance Company, 248 N.C. 224, 103 S.E.2d 8, 70 A.L.R.2d 408 (1958), the Supreme Court of North Carolina said:
“The courts which have been called upon to' consider the question are in agreement that an insurer may settle part of multiple claims arising from the negligence of its insured, even though such settlements result in preference by exhausting the fund to which the injured party whose claim has not been settled might otherwise look for payment. (Citations omitted.) Nor may a court require the insurance company to pay the fund into its register for ratable distribution among claimants.”
In addition to the authorities cited, we also have considered: Liguori v. Allstate Insurance Company, 76 N.J.Super. 204, 184 A.2d 12 (1962); Duprey v. Security Mutual Casualty Co., 22 A.D.2d 544, 256 N.Y.S.2d 987 (1965); O’Dwyer v. Grove Service Corp., 15 Misc.2d 154, 181 N.Y.S.2d 338, affirmed 15 A.D.2d 457, 222 N.Y.S.2d 683 (1961); Bruyette v. Sandini, 291 Mass. 373, 197 N.E. 29 (1935); Bennett v. Conrady, 180 Kan. 485, 305 P.2d 823 (1957); Bartlett v. Travelers’ Insurance Company, 117 Conn. 147, 167 A. 180 (1933); Alford v. Textile Insurance Company, 248 N.C. 224, 103 S.E.2d 8, 70 A.L.R.2d 408 (1958); Henderson v. International Service Insurance Company, 65 Wash.2d 300, 396 P.2d 877 (1965); Brown v. United States F. & G., 314 F.2d 675 (2nd Cir. 1963); 22 La.L.R. 214; 70 Harvard L.R. 27.
If plaintiff’s injuries are as serious as she contends, then we must recognize the apparent inequity which has resulted from the settlement of other claims arising out of the same accident, depleting the insurance fund which originally was available to all claimants. We also are aware of the fact that if the rule stated in the above quoted authorities is made applicable generally in this state, then instances may arise where the insurance fund is entirely depleted by compromise settlements, leaving nothing for other meritorious claimants.
The policy of the law of Louisiana, however, is to favor the compromise and settlement of disputes.[6] If the rule urged by plaintiff here should be adopted it would have the effect of discouraging, rather than encouraging, the settlement of cases, because each compromise settlement effected by the insurer would subject it to the risk of liability in excess of the policy limits. To hold that the policy is for the benefit of all injured persons pro rata would make it necessary for the insurer to ascertain how many persons have claims arising from the accident and to pro rate those claims before any one of them could be paid safely. The practical effect of such a ruling would be to compel the insurer to institute an interpleader or a concursus proceeding in every such case where there are multiple claims, and thus all of the claimants would have to resort to litigation in order to recover anything. .
Although LSA-R.S. 22:655 provides that liability policies are executed for the benefit of all injured persons, our law also recognizes that the insurer owes a duty to its insured. It has been held that when an insurer rejects a reasonable offer of compromise which is to the obvious best interest of its insured, and judgment thereafter is obtained in excess of the policy limits, the insurer may be held liable to its insured for the excess. See Wooten v. Central Mutual Insurance Company, 166 So.2d 747 (La.App. 3d Cir. 1964); and Roberie v. *480 Southern Farm Bureau Casualty Ins. Co., 250 La. 105, 194 So.2d 713 (1967). If plaintiff’s argument is adopted in the present suit, the precedent so established may prevent an insurer hereafter from protecting its insured by making a settlement which would be to the obvious best interest of the latter.
The policy of insurance which was issued by Southern Farm covering the Richard car expressly provides that “The company may make such investigation and settlement of any claim or suit as it deems expedient.”
Our conclusion is that the general rule should be applied here. Where there are multiple claims arising out of one accident, the liability insurer, in good faith, may enter into reasonable compromise settlements with and may pay some of the claimants, even though such payments may reduce or completely exhaust the insurance fund originally available to pay all claims, so that the remaining claimants have little or no recourse against the insurer.
In view of that conclusion, the question is presented of whether Southern Farm acted in bad faith in settling some of the multiple claims in this case and whether the settlements were reasonable. Plaintiff does not contend that the insurer was in bad faith, and we find nothing in the evidence tending to show bad faith on its part in settling any of the three claims hereinabove listed. The injuries sustained by Boehmer as a result of this accident consisted, in part, of a laceration of the right eyebrow requiring five stitches, a fractured knee cap, a bruised kidney, two black eyes, and abrasions of the head and arms. He was knocked unconscious from the blow, he wore a cast on his leg for six weeks and he used crutches for some time thereafter. Southern Farm was clearly liable to Boehmer and we think the payment made to him in settlement of his claim was reasonable. Plaintiff does not contend that the amount paid to Miss Zerangue was excessive or unreasonable.
Southern Farm is entitled to credit for the full amounts which it paid to Boehmer, to Miss Zerangue and to American Insurance Company as compromise settlements of some of the multiple claims arising out of this accident, and its liability to the other claimants is limited to the remaining balance of $3772.61.
Defendant, Southern Farm, contends that the award to plaintiff in the instant suit is excessive and should be reduced from $3772.61 to the sum of $3500.00. The injuries which plaintiff sustained as a result of this accident included a left sacroiliac subluxation, multiple lacerations of the ear and eyelid, multiple lacerations and deep abrasions of the right arm, shoulder and right hip, and fracture of the right pubic rami. She was hospitalized on three occasions for a total of about four weeks. She was subjected to surgery on three occasions, she wore a body cast and she was required to use crutches until about November 26, 1965. Her lacerations have healed and she has recovered from the fracture without any apparent disability, but she now has extensive scarring of the right arm, ear, shoulder and hip as a result of the accident. Her treating physician has recommended plastic surgery for some of these scars.
Southern Farm has paid $1547.69 as plaintiff’s medical expenses under the medical payments clause of the policy. The trial judge held that in addition thereto plaintiff was entitled to an award of “$5,-500.00 or more” for her “pain, suffering, disability, scarring and disfigurement.” Since cnly $3772.61 remained available within the policy limits, however, judgment was rendered awarding plaintiff that amount.
*481 After considering the serious nature of the injuries which were sustained by plaintiff, we find no merit to defendant’s argument that the award made to her should be reduced.
Finally, Southern Farm argues that the trial court erred in assessing to it all of the costs of this suit, including the costs of transcribing the evidence for all of the consolidated cases.
 LSA-C.C.P. art. 1920 provides that “[unless] otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.” The court has “great discretion” in assessing costs, and we find no abuse of discretion by the trial court in the assessment of costs in the instant suit.
Southern Farm argues that it tendered the balance of the policy limits to plaintiff prior to the filing of suit and that it again made such a tender after suit had been filed. The record shows two letters were written by that defendant to plaintiffs’ counsel, one of which was written before the suit was filed and the other after, and that in each of those letters defendant asserted its willingness to pay the balance of the policy limits for a complete release. No formal tender was made, and we agree with the trial judge that these letters do not constitute a tender sufficient to relieve defendant of its obligation for costs.
For the reasons herein assigned, the judgment appealed from is affirmed. One-half the costs of this appeal are assessed to plaintiff-appellant, Mrs. Earline Richard Robin, and the remaining one-half of such costs are assessed to defendant-appellant, Southern Farm Bureau Casualty Insurance Company.
Affirmed.

. The suit was originally instituted by Francis Richard, as tutor ad hoc for the minor, Earline Richard. While the suit was pending, however, the minor was emancipated by marriage and she was substituted as plaintiff in lieu of the original petitioner.

. Koob v. Cooperative Cab Co., 213 La. 903, 35 So.2d 849 (1948); State Farm Mutual Automobile Insurance Company v. Merritt, 185 So.2d 832 (La.App.3d Cir. 1966); Sims v. Miller, 193 So.2d 890 (La.App.3d Cir. 1967); American Insurance Company v. Speights, 206 So.2d 295 (La.App.1st Cir. 1968).

. Koob v. Cooperative Cab Company, supra; Adams v. Kimble, 208 So.2d 14 (La.App.1st Cir. 1968); Patterson v. Allstate Insurance Company, 147 So.2d 901 (La.App.3d Cir. 1963, cert. denied).

. Scott v. Glazer, 164 So.2d 185 (La.App. 4th Cir. 1964); Franicevich v. Lirette, 241 La. 466, 129 So.2d 740 (1961).

. Sorrell v. Allstate Insurance Company, 179 So.2d 499 (La.App.3d Cir. 1965, writ refused); Jones v. Employers Liability Assurance Corp., 203 So.2d 383 (La.App.3d Cir. 1967); Scott v. Glazer, supra.

. Young v. Barelli, 169 La. 319, 125 So. 258 (1929); Beck v. Continental Casualty Co., 145 So. 810 (La.App.2d Cir. 1933); Spears v. St. Charles Dairy, 194 So. 738 (La.App.Orl. Cir. 1940); Jackson v. United States Fidelity & Guaranty Co., 199 So. 419 (La.App.2d Cir. 1940); Lervick v. White Top Cabs, 10 So.2d 67 (La.App.Orl. Cir. 1942); Wise v. Prescott, 142 So.2d 613 (La.App.4th Cir. 1962).